568 So.2d 669 (1990)
Janet Crowther, wife of/and James CROWTHER
v.
KMART CORPORATION and Continental Insurance Company.
No. 89-CA-2296.
Court of Appeal of Louisiana, Fourth Circuit.
October 4, 1990.
Writ Denied December 14, 1990.
*671 J. Wayne Mumphrey, Law Offices of J. Wayne Mumphrey, Chalmette, for plaintiffs-appellees.
Rodney A. Seydel, Jr., Hoffman, Sutterfield, Ensenat & Bankston, New Orleans, for defendants-appellants.
Before SCHOTT, C.J., and BARRY and BYRNES, JJ.
BARRY, Judge.
This appeal is from a judgment notwithstanding the verdict entered in a suit for personal injuries sustained by Janet Crowther during a "Blue Light Special" at a Kmart store.

FACTS
On November 24, 1985 Crowther was shopping for towels in the Chalmette Kmart store when a "Blue Light Special"[1] for Cabbage Patch doll clothes was announced. A merchandise cart containing the doll clothes was located in the main aisle where Crowther was shopping. When the special was announced, a crowd of shoppers "went wild" and swarmed around the merchandise cart. Doll clothes were knocked off the cart and people were pushed to the floor. Crowther was pinned against the counter. Her leg was caught between the cart and counter and she was jammed into a rack containing towels with metal shelf supports which stuck into her back and neck.
Crowther sued Kmart and Continental Insurance Co. for her injuries. Prior to trial a joint motion to dismiss Continental was granted. The jury found Crowther 72% negligent, Kmart 28% negligent and awarded damages totaling $270,000. Judgment was rendered in favor of Crowther for $75,600.
Crowther filed a motion for judgment notwithstanding the verdict (J.N.O.V.) or, alternatively, for a new trial. Kmart filed a motion for J.N.O.V. or, alternatively, for remittitur.
The trial court denied Kmart's motion for J.N.O.V. or remittitur and Crowther's motion for a new trial. Crowther's motion for J.N.O.V. was granted as to (1) the jury's finding of negligence on Crowther's part and (2) the jury's failure to award damages for loss of earning capacity and permanent partial disability. The jury's finding that Crowther was 72% negligent was reversed. Awards for loss of earning capacity and permanent partial disability were set at $50,000 and $20,000 respectively. Judgment was rendered in Crowther's favor as follows:

Past and future medical expenses $200,000
Past and future physical pain and
 suffering 50,000
Past and future mental suffering 20,000
Loss of earning capacity 50,000
Permanent partial disability 20,000
 ________
 TOTAL $340,000

We affirm.

FACTUAL BACKGROUND
James Carey, a ten year Kmart employee and assistant manager on duty at the time of the incident, testified that on November 24, 1985 Kmart had continuous "Blue Light Specials" with an "enthusiastic" crowd of thirty to forty people following the "Blue Light" locations. He stated that Cabbage Patch doll clothing was offered for half-price during the "Special" in unmarked cartons stacked on a wheeled cart. The wheels of the cart were not locked or *672 blocked, nor was the cart braked. He stated that five employees usually worked a "Special" including two stockmen who prevented children from running through the area. He did not know if any employees were at the scene of the incident.
Carey announced the "Special" and led some customers from the merchandise cart to the toy department where more merchandise was available.
During the "Special" Carey did not see or hear anything unusual. The crowd was not out of control and did not push or shove. Carey did not see anyone get hurt or hear a scream. Though he had previously stated that thirty to forty people were following the "Blue Light" around the store, he did not anticipate that it would be necessary to curtail the "Special."
He stated that in 1985 Cabbage Patch dolls were not a "hot" item, but acknowledged in his deposition statements that 1984 was the best year for Cabbage Patch dolls, that they were popular in 1985, and people would want clothes for the dolls.
Mino Manzanera, a Kmart employee for almost eleven years, was the toy department manager. Manzanera pushed the cart out of the stockroom for the "Special" and picked the location for the sale. She selected the site because it was a clear area where people would not be confused as to what item was being promoted. She testified that pursuant to regular procedure three people usually work a "Special," including a pricer and stock people. She did not testify as to how many employees were present.
Manzanera denied seeing anyone injured, pushed or shoved during the "Special." On cross examination she responded "Is that what I said?" In her deposition Manzanera stated the crowd pushed and shoved to get to the sale. She explained that she did not know what was going on since she was not there the entire time and "I was just getting the merchandise, you know." She admitted that there might have been pushing, shoving and screaming but denied seeing anyone knocked down or injured.
Brenda Hingle, a Kmart employee for nine years, filled out accident reports, but none were introduced at trial. Hingle testified she did not remember Crowther but that "the lady" told her only that she had hurt her ankle when it caught on the end of the cart. Under cross she admitted stating at her deposition that she did not remember the substance of her conversation with "the lady."
Hingle named three employees who she "assumed" were working the "Special", but she did not witness the "Special" and could not say they were present. None of the named employees testified at trial. She stated that the "Special" was held in the domestics department "so nobody would get hurt at that time because there was quite a few people back there" and that stock boys are usually present for crowd control at "Blue Light Specials."
Hilda McGee, an employee of Kmart for eleven years, also filled out accident reports. She testified that she had never seen a person injured during a "Special", but on some occasions management had threatened to stop a "Special" because children were running through the aisles. She stated she could not remember if a "Blue Light Special" had ever been stopped because of a crowd, but acknowledged stating by deposition that such a promotion had been stopped for that reason.
Linda Mixon, a witness, did not know nor did she talk to Crowther or her counsel prior to trial. Mixon testified that she was shopping in the back of the store when a lady wheeled out a flat bed truck with a big box on it. The "Blue Light" announcement was made and "[b]efore they finished the sentence the people just swarmed the area" and
[W]ent wild ... started pulling things, knocking people down. They had knocked one lady on the floor. One lady was pinned up against the counter with her leg caught between the flat bed, and her back was up against the counter with those iron sticks sticking in it screaming for help. The lady on the floor was screaming, please, somebody help me. I reached in to try to pull her up off the floor because she *673 was screaming for help. This lady was begging, too. Please, just get them off of me. Just move the buggy off my leg, please. They were begging for help. Nobody would even stop to help them. They wouldn't even stop the blue light special.
Q Did you see the K-Mart employees attempt to help her?
A Sure never.
Q Did you attempt to help someone?
A I tried to help the lady on the floor because she was screaming. The people were stomping her. I reached in to help her off the floor and I got hurt.
Q How did you get hurt, Ms. Mixon?
A Grabbed my armgrabbed my arm up and almost pulled it out the socket.
Q And you saw, well, Janet Crowther jammed against?
A I saw her jammed against the counter, her leg was. That cart was up against her leg and her back up against the counter and they have those iron things that hold stuff on them. They were in her back.
Q And you said you observed Ms. Crowther screaming?
A I heard her screaming, and I heard the lady on the floor screaming, too.
Q Was it clear to hear the screaming?
A It was clear to me. It should be clear to anybody.
Q Did it sound like chatter?
A No, she was hollering, "Please, please, somebody help me".
Q Did you see any K-Mart employee come to aid Ms. Crowther, or the lady on the floor?
A No, I did not.
Amy Hughes witnessed the incident when she was looking at towels. A woman she did not know (identified as Crowther) was also looking at towels. Someone moved the cart next to them. Either Crowther or Hughes remarked it was possible the towels would be put on sale. When the "Blue Light" was turned on and announcement was made the area turn into "bedlam." Hughes could not get out of the crowd and she saw Crowther caught between the cart and towel rack being pushed into shelves. Hughes' foot got caught but she was helped by two other shoppers. She stated that she avoids "Blue Light Specials" on toys and "hot items", especially at Christmas time. Hughes stated two Kmart employees were present during the "Special."
Doris Quakenbush, a shopper, testified the "Special" was "mad chaos." She was knocked to the floor and lost a shoe. Quakenbush suffered bruises and was shaken up.
Crowther testified that on November 24, 1985 she entered the store and participated in a "Special" on brass items. She proceeded to the back of the store to look at towels and was half-way back when she noticed a "huge crowd of people came in." While looking at towels she saw the "Blue Light" coming toward her but thought the "Special" was going to the toy department. The sale began and she was crushed against the shelves. The rest of her testimony was similar to that of the other shoppers.
Crowther blacked out and when she came to a man identified himself as the manager. He told her that he saw what happened but could not get through the crowd to help her.
Dr. Milton Pressley, Kmart's expert in retail marketing, testified regarding the popularity of Cabbage Patch dolls versus Cabbage Patch accessories. He said the doll's popularity dropped to number three behind two "boys" toys by 1985. Extra security measures had been taken regarding the dolls but never for the accessories. Pressley has no educational background related to safety, but stated that pursuant to his review of Kmart procedures the "Specials" are conducted in a safe and reasonable manner. He explained the procedure included two price markers and two stock boys to correct problems.

DAMAGES
Crowther was taken by ambulance to a hospital. She had pain in her neck, back and shoulders and the diagnosis was soft tissue injuries. She received injections for *674 pain and a tranquilizer. Her legs were placed in compression bandages and she was advised to use crutches and stay in bed.
Her pain worsened and she saw Dr. Philip Jones, internist, on December 13, 1985. Dr. Jones testified that Crowther had severe symptoms. His diagnosis was that she sustained multiple contusions of both legs and cervical and lumbar strains. He prescribed oral medication and physical therapy.
Crowther was hospitalized in February, 1986 because of nerve pain in her left leg. In February, 1987 Dr. Ralph Gessner, orthopedist, performed tarsal tunnel release surgery on the left ankle to remove scarring around the nerves. The surgery did not alleviate the pain. Dr. Gessner testified that Crowther continues to have symptoms of tarsal tunnel syndrome "even to this day."
Dr. Amilcar Correa, the neurosurgeon who operated with Dr. Gessner on Crowther in 1982, saw her in July, 1987 at Dr. Gessner's request. Crowther was complaining of neck pain that radiated down her left arm into her fingers.
She continued to complain of back and neck pain. Prior to the Kmart accident Crowther had two lower back surgeries and a cervical fusion which were apparently successful because after the the last operation in 1982 she did not report further symptoms until after the 1985 accident. In 1987 medical tests revealed that she suffered from an incomplete fusion of the C4-5 vertebrae (operated on in 1982) and a herniation of the C5-6 disc.
Dr. Gessner and Dr. Correa testified that there was no evidence that the C4-5 fusion had not healed following the 1982 operation. Crowther was asymptomatic prior to the incident at Kmart. Dr. Gessner said that it was possible that the subject accident had cracked or broken the C4-5 fusion.
On September 15, 1987 Crowther had an anterior cervical diskectomy at C4-5. She continued to experience pain in her neck and upper back and by March of 1988 all of the prior symptoms had returned.
Crowther has been under the treatment of Dr. Kenneth Vogel, neurosurgeon, since July, 1988. Dr. Vogel testified that she has experienced back, leg, neck and bilateral arm pain as well as interscapular pain. He prescribed epidural blocks, physiotherapy and muscle relaxant medication. Dr. Vogel described Crowther's present status:
Well, we are now in a situation where I don't have a way to relieve her pain. We have done the facet block. It doesn't help; had her physical therapy. She's had the surgery. We now did the epidural block, and now I don't have a mechanism for relieving pain except for giving medication which is not a very comfortable position for me. I don't know what else to do for this lady at this point in time.

SPECIFICATION ONE
Kmart urges that the unruly crowd was not foreseeable and it was not negligent.
For cases tried after July 18, 1988, La. R.S. 9:2800.6 provides for a merchant's liability:
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
B. In a suit for damages by a person who has suffered damages as the result of a hazardous condition while on the merchant's premises, the person must prove that the accident was caused by a hazardous condition. The burden of proof then shifts to the merchant to prove that he acted in a reasonably prudent manner in exercising the duty of care he owed to the person to keep the premises free of any hazardous condition.
C. In exculpating himself from liability under this Subsection, the merchant need not introduce the testimony of every employee of the merchant or any particular proportion thereof, but is only *675 required to introduce the testimony of any employee shown to have actually created the hazardous condition and those employees and management personnel whose job responsibilities included inspection or cleanup of the area where the accident giving rise to the damages occurred.
D. `Merchant' means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business.
Under Section B a plaintiff must establish the accident was caused by a hazardous condition on the premises. The burden then shifts to the merchant to prove he acted in a "reasonably prudent manner" to keep the premises free of a hazardous condition. Section B parallels the existing jurisprudence. Estes v. Kroger Co., 556 So.2d 240 (La.App.2d Cir.1990), writ denied 559 So.2d 1360 (La.1990). The store must prove that it did not create the hazard and store personnel exercised the requisite degree of care. Brown v. Winn-Dixie Louisiana, Inc., 452 So.2d 685 (La.1984). In McCardie v. Wal-Mart Stores, Inc., 511 So.2d 1134 (La.1987) the court concluded that Wal-Mart did not meet its twofold burden under Brown because it failed to prove that its employees did not cause the spill. The court noted that many Wal-Mart employees who could have caused the spill did not testify and held that merely proving adequate clean-up procedures was insufficient.
La.R.S. 9:2800.6 was enacted to counteract McCardie. Section C of the statute lessens the merchant's burden. Nonetheless, 9:2800.6(C) requires testimony as to "any employee shown to have actually created the hazardous condition" plus management personnel and any employee "whose job responsibilities included inspection or cleanup of the area where the accident giving rise to the damages occurred." Diaz v. Schwegmann Giant Supermarkets, 533 So.2d 1034 (La.App. 4th Cir.1988).
The threshold issue, whether Crowther proved that the accident was caused by a hazardous condition, is not disputed by Kmart. Kmart urges that it "acted in a reasonably prudent manner in exercising the duty of care [it] owed to the person to keep the premises free of any hazardous condition." We disagree.
Kmart's "Blue Light Special" is designed to attract attention and customersas many as possiblein a short period of time and in a limited area. The merchandise was on an unsecured rolling cart and the promotion attracted "thirty to forty enthusiastic" people who were not controlled by store personnel. Kmart was clearly negligent.
A court of appeal may not set aside the trier of facts' finding unless it is manifestly erroneous or clearly wrong. Reasonable valuations of credibility and inferences of fact should not be disturbed on review, even if the appellate court believes its valuations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La. 1989).
The jury properly concluded that Kmart failed to exculpate itself from liability.

SPECIFICATION TWO
Kmart urges that $200,000 for past and future medical expenses was excessive.
Plaintiff's exhibit 2 documents past medical expenses of $76,000. We are satisfied that award is supported by the record.
The evidence as to future medicals was presented by Dr. Vogel. Future medical expenses must be established with some degree of certainty and a plaintiff must show that the expenses more probably than not will be incurred. Boothe v. New Orleans Public Service Inc., 447 So.2d 620 (La.App. 4th Cir.1984).
Dr. Vogel, an expert in neurosurgery and neurology, recommended a rehabilitation program at Mercy Hospital in which Crowther would be hospitalized for two weeks and treated as an outpatient for six to eight weeks. Dr. Vogel estimated the hospital costs at $10,000. If rehabilitation was successful Crowther would probably have to see her family doctor once or twice a year the rest of her life because of aches and pains. She would require more frequent treatment if rehabilitation did not *676 succeed and further surgery could be required.
Dr. Vogel's recommendations and estimates are uncontradicted. The award of $124,000 for future medicals appears high, but we have no basis to conclude that the jury was clearly wrong.

SPECIFICATION THREE
Kmart argues it was error to grant a J.N.O.V. as to the jury's finding that Crowther was 72% negligent. The trial court held that Crowther was not negligent.
In Scott v. Hospital Service District No. 1 of the Parish of St. Charles, 496 So.2d 270, 274 (La.1986), the Louisiana Supreme Court held that the standard for a J.N.O.V. "requires that the motion be granted only when the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover."
In ruling on a motion for a judgment notwithstanding the verdict ... the trial judge considers all of the evidence and reasonable inferences in a light most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary verdict, the motion should be granted and the trial judge should render a judgment notwithstanding the jury's findings. On the other hand, if there is substantial evidence of such quality and weight that reasonable and fair minded persons in the exercise of impartial judgment might reach different conclusions, the motion for judgment N.O.V. should be denied. In applying this standard, the court does not weigh the evidence, pass on the credibility of the witnesses, or substitute its factual judgment for the jury's. (citations omitted)
Blum v. New Orleans Public Service, Inc., 469 So.2d 1117, 1119 (La.App. 4th Cir.1985), writ denied 472 So.2d 921 (La.1985).
We do not find anything that even suggests Crowther did something wrong. Kmart argues that Crowther was negligent because she participated in one "Special" and might have participated in another. Kmart ignored its responsibility to keep its aisles in a safe condition. The store lured customers with a marketing technique which proved to be volatile, it failed to rectify a dangerous situation, and now attempts to shift its fault.
The facts overwhelmingly convince us that reasonable persons could not conclude that Crowther was negligent. The J.N. O.V. properly reflects that Kmart was solely responsible for Crowther's injuries.

SPECIFICATION FOUR
Kmart argues that the trial court erred by granting Crowther's motion for a J.N. O.V. on the damages, or alternatively, in the increase of the award. The jury entered no award for lost earning capacity or permanent partial disability. The trial judge awarded plaintiff $50,000 for loss of earning capacity and $20,000 for partial permanent disability.
A jury errs as a matter of law by refusing to award general damages for objective injuries. Gormley v. Grand Lodge of State of Louisiana, 503 So.2d 181 (La.App. 4th Cir.1987), writ denied 506 So.2d 1227 (La.1987). Curry on behalf of Curry v. Allstate Insurance Company, 435 So.2d 1030 (La.App. 4th Cir. 1983). The trial court may grant a judgment notwithstanding the verdict on the issue of damages alone. Roger v. Cancienne, 538 So.2d 670 (La.App. 4th Cir.1989), writ denied 542 So.2d 1382 (La.1989). "Where the trial court is convinced that reasonable minds could not differ as to the amount of damages in light of the evidence, the court should have the authority to grant the appropriate judgment notwithstanding the verdict." Official Comment La.C.C.P. Art. 1811; Roger, supra 538 So.2d at 673; Bellard v. CNA Insurance Co., 503 So.2d 1104 (La.App. 3rd Cir.1987), writ denied 506 So.2d 1228 (La.1987), reconsideration denied 508 So.2d 817 (La.1987).
*677 The trial judge's reasons for the J.N.O.V. state: "The jury's failure to assess any impairment of past and future earning capacity or permanent partial disability was so contrary to the evidence presented that an additional damage award was required."

Lost Earnings
Crowther had been a housewife for a number of years. She received her real estate license but had not returned to work. Kmart argues that Crowther did not present evidence that she would have worked as a real estate agent.
Earnings before and after an injury are not the proper measure of an award for lost earnings. Even if a plaintiff is unemployed at the time of an injury he is entitled to an award for impairment or diminution of earning power. Folse v. Fakouri, 371 So.2d 1120, 1123 (La.1979). Folse held: "Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may have never seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily." Folse, 371 So.2d at 1124.
Awards for future lost income are speculative at best and difficult to calculate with mathematical certainty. In determining such an award, courts must exercise judicial discretion consistent with the record and be fair to all parties. Pitts v. Bailes, 551 So.2d 1363, 1378 (La.App. 3rd Cir.1989), writs denied 553 So.2d 860 (La. 1989) and 556 So.2d 1262 (La.1990); Hunt v. Board of Supervisors of Louisiana State University and Agriculture and Mechanical College, 522 So.2d 1144, 1152 (La.App. 2d Cir.1988); Harris v. Pineset, 499 So.2d 499 (La.App. 2d Cir.1986), writ denied 502 So.2d 117 (La.1987). This and other circuits apply the manifest error rule in reviewing a judgment notwithstanding the verdict. Roger, supra 538 So.2d at 673; Pitts, 551 So.2d at 1373; Robertson v. Penn, 472 So.2d 927 (La.App. 1st Cir.1985), writ denied 476 So.2d 353 (La.1985).
The record shows that Crowther sustained debilitating injuries which will affect her future employment. An appellate court should not disturb quantum unless the lower court abused its "much" discretion. Roger, supra 538 So.2d at 673. Pitts, supra 551 So.2d at 1373.
Plaintiff presented testimony that the present value of her lost earning capacity could be as high as $170,667. The defense expert estimated her future lost earning capacity (if any) at $49,650 to $55,777.
We find the trial judge did not abuse his discretion by awarding $50,000 for lost earnings, a sum consistent with the lowest amount suggested by the defense.

Permanent Partial Disability
Dr. Vogel testified that prior to the accident Crowther was approximately 25-30% disabled as a result of prior back and neck surgeries. Her medical records indicate that she achieved a satisfactory result from those surgeries. We are impressed that she required medical attention only once during the three years prior to the accident.
Crowther testified that during the three year period she engaged in gardening, normal homemaking activities, and graduated from real estate school. She went camping and fishing on vacations with her family. However, since surgery following the subject accident she cannot cook or shop for groceries due to constant pain. She rarely drives an automobile. She does not socialize or engage in marital activities with her husband.
According to Dr. Vogel, Crowther now has a 35-40% total anatomical disability. She has undergone three epidural blocks (as well as other medical procedures) in an attempt to relieve pain. Those treatments have been unsuccessful. Dr. Vogel testified it is unlikely that Crowther will ever be pain-free. She is functionally disabled from pursuing real estate sales or leading "a reasonable social life."
*678 Under these circumstances we find the trial court's award of $20,000 for plaintiff's permanent partial disability was reasonable and not an abuse of discretion.

SPECIFICATION FIVE
Defendant argues that the trial judge erred by admitting the testimony of two of plaintiff's witnesses, Wayne Sandoz and Dr. Seymour Goodman.
Mr. Sandoz, a real estate agent and appraiser, testified concerning the average earnings of local real estate agents. Dr. Goodman, economist, testified as to the present value of Crowther's loss of earning capacity based on figures supplied by Mr. Sandoz. Defendant argues their testimony was speculative.
It is apparent the trial court did not rely on that testimony. The J.N.O.V. award for lost earnings was lower than the amounts submitted by plaintiff and approximates the lowest estimate advanced by Kmart.
This assignment has no merit.
The judgment is affirmed.
AFFIRMED.
SCHOTT, Chief Judge, dissenting in part:
This case was submitted to the jury for a general verdict with written interrogatories pursuant to C.C.P. art. 1813. Following the interrogatories on fault were five on categories of damages, 1) past and future medical expenses, 2) physical pain and suffering, 3) mental pain and suffering, 4) impairment of earning capacity, past and future, and 5) permanent or partial disability. The jury awarded $200,000, $50,000, and $20,000 respectively for the first three categories but "-0-" for each of the last two categories. The trial court granted plaintiff's motion for judgment notwithstanding the jury's verdict as to liability and damages, reversing the jury's finding of contributory negligence on plaintiff's part and increasing the general verdict by awarding $50,000 for impairment of earning capacity and $20,000 for disability.
As discussed in the majority opinion, the trial court considering a motion for a judgment notwithstanding the verdict must consider the evidence and reasonable inferences in the light most favorable to the opposing party. The court may grant the motion only if the facts and inferences supporting it point so strongly and overwhelmingly in favor of the mover that reasonable jurors could not have arrived at a contrary verdict. However, if the evidence is such that reasonable, fair minded and impartial jurors could reach a contrary verdict to the one advocated by the mover the court should deny the motion. In evaluating the motion the trial judge may not weigh evidence, pass on the credibility of witnesses, or substitute factual judgment for the jury's.
Applying these standards to the trial court's reversal of the jury's finding of contributory negligence on the part of plaintiff, I readily agree with my colleagues that the motion for judgment notwithstanding the verdict was properly granted. The record furnishes no basis for the jury's conclusion in this regard.
On the other hand, the standards for the granting of the motion with respect to quantum do not support the trial court's action. The jury's factual conclusion that a plaintiff is not entitled to an element of damages is not susceptible to reversal unless clearly wrong. Furthermore, in assessing damages the jury is vested with great discretion and the award should not be modified unless it constituted an abuse of that great discretion. While the trial judge may have strongly disagreed with the jury's decision that an award for impairment of earning capacity and permanent disability was inappropriate and unsupported by the evidence, he was not authorized to substitute his opinion for the jury's by weighing the evidence and making his own credibility calls and findings of fact.
Before this accident plaintiff had undergone extensive treatment for problems with her cervical spine. Only a few days before the accident she was hospitalized for these problems along with others. In the very best position to evaluate her condition was Dr. Correa who performed both cervical *679 fusions on her, one in 1982 and the other in 1987. Asked whether he would attribute her present problems to the 1985 accident as opposed to her pre-accident condition he said he would, unless she was having problems before the accident. Dr. Correa was not aware of her hospitalization just before the accident for cervical problems.
Dr. Bertucci was plaintiff's regular general physician before and after the accident. He is the one who put her in the hospital for cervical problems before the accident and although plaintiff went to him several times after the accident she did not mention neck pain to him until March, 1986. Similarly, Dr. Gessner saw her a number of times after the accident but she didn't mention her neck problems to him until sometime in 1986.
The jury had the benefit of plaintiff's testimony as well as Dr. Jones', Dr. Vogel's and all the other physicians'. The questions for the jury were 1) whether her earning capacity was impaired as a result of the K-Mart accident or whether it was already impaired by her chronic cervical condition and 2) whether she was rendered disabled by the K-Mart accident or was she already disabled. The jury weighed the evidence and made credibility evaluations which led them to conclude the K-Mart accident did not cause her earning capacity to be impaired or her disability. Reasonable, fair minded, and impartial jurors could easily reach these conclusions. The trial judge's substitution of his own factual findings and conclusions for theirs led him to commit an error of law in granting the motion for judgment notwithstanding the verdict as to damages.
Folse v. Fakauri, 371 So.2d 1120 (La. 1979), does not support the majority position. There, the court held that earning capacity is not necessarily determined by actual loss and that damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. Id. at 1124. Thus, the awarding of damages for impairment of earning capacity depends on the facts of the case. The mere fact that plaintiff held a real estate agent's license does not necessarily mean that she could have earned money from this had it not been for the present accident. As already discussed, the jury may have concluded that her pre-accident disability already impaired her earning capacity. Or they may have concluded that even before the accident she lacked the motivation, determination and industry to earn money as a real estate agent. These are factual conclusions for the jury to make after assessing the testimony of the plaintiff and the other witnesses. Significantly, there is no contention by plaintiff that the instructions to the jury were in any way erroneous. The argument is purely factual. The motion for judgment notwithstanding the jury's verdict does not give the trial judge the right to usurp the jury's fact finding and credibility evaluating functions.
NOTES
[1] "Blue Light Special" is a Kmart marketing technique. A price is reduced on a specific item and announced as available for a certain time period, usually fifteen minutes. Customers obtain the merchandise at a station designated by a flashing blue light. The station moves to a different location for each "Special."