606 So.2d 804 (1992)
Milton SMITH
v.
TWO "R" DRILLING COMPANY, INC. and Arco Oil and Gas Company.
No. 91-CA-0548.
Court of Appeal of Louisiana, Fourth Circuit.
August 20, 1992.
Writ Denied November 20, 1992.
*806 Julian R. Murray, Jr., Murray, Braden, Gonzalez & Richardson, New Orleans, Ivan David Warner, III, Carimi Law Firm, Metairie, for plaintiff-appellee and cross-appellant, Milton Smith.
W.K. Christovich, E. Phelps Gay, Christovich & Kearney, New Orleans, for defendants-appellants, Two R Drilling Co., Inc., and Arco Oil & Gas Corp.
Ben E. Clayton, Lenfant & Associates, Metairie, for intervenor/appellee and cross-appellant, Aetna Cas. and Sur. Co.
Before BARRY, CIACCIO and WALTZER, JJ.
WALTZER, Judge.
This appeal is from a jury verdict in favor of plaintiff Milton Smith and against the operator and rig owner, Arco Oil and Gas Corporation (Arco) and the rig contractor, Two "R" Drilling Company, Inc. (Two "R" Drilling), granting damages of $750,000.00 because of inhalation of toxic fumes which rendered him permanently and totally disabled. Arco and Two "R" Drilling were each found fifty percent at fault.
Defendants argue that the jury's verdict was manifestly erroneous. Plaintiff cross-appealed contending that the trial judge erred in failing to award prejudgment interest. Aetna Casualty and Surety Company *807 is the worker's compensation insurer of Amigo Enterprises, Inc. (Amigo). Aetna intervened in the suit. Aetna argues that the trial judge failed to award it legal interest and costs.

I. FACTS
Smith was an employee of Amigo which is in the business of supplying temporary laborers for the offshore oil industry. On November 23, 1986, Amigo sent a crew of roustabouts to rig No. 2R17 to work for Two "R" Drilling, the drilling contractor, and ARCO, the rig owner. Plaintiff was a member of the Amigo crew. Drilling operations on the rig were shutting down and Amigo's crew was hired to clean the "mud tanks" on the rig.
Two "R" Drilling toolpusher Carroll Dufrene sent Milton Smith and his fellow employees, Larry Chaupetta and Earl Dickett to clean oil and mud residue stuck to the mud tank walls. All of the mud tanks were eight feet deep and ranged from sixteen feet by nine feet (16' X 9') to fifteen feet by twenty-four feet (15' X 24'). Each tank was covered by grating and contained a large fan at one end. The fan was used not only for circulation, but also to trap particles and force them down and into the tank. A diesel powered steam cleaning machine located on the grate was used to clean the tanks. The steam cleaner machine mixed cleaning fluid with steam, forcing the mixture down a long hose and out a "wand" on the end. When the mixture was sprayed onto the wall, it would break down the substance causing it to fall to the bottom where it would float. The men then shoveled the muddy residue into five gallon buckets and carried it out of the tank.
Plaintiff alleges that he was rendered totally disabled when he was exposed to toxic fumes while cleaning the mud tanks. An accident report and a "morning report" indicate that plaintiff reported pulling a muscle while hauling a five gallon bucket. Neither report suggests that plaintiff inhaled toxic fumes. Smith and Dickett testified at trial that the conditions in the tank were noxious. Milton Smith testified that he and his fellow employees requested respirators, but their request was refused. Smith, Chaupetta and Dickett all further testified that the steam cleaning machine ignited, causing a fire and that plaintiff was overcome and passed out while climbing the ladder to exit the tank. As a result of this accident, plaintiff complains of permanent damage to his bronchial tubes and lungs, and the onset of seizures.
The jury awarded $250,000.00 for past, present and future medical expenses, $100,000.00 for past, present and future physical and mental pain and suffering, $75,000.00 for permanent disability, and $325,000.00 for past, present, and future loss of earnings. Aetna was awarded $55,823.58 on its intervention as Amigo's worker's compensation carrier.

II. SPECIFICATIONS OF ERROR
Defendants assign the following specifications of error:
1) The jury erred in ignoring uncontradicted testimony;
2) The jury erred in awarding excessive damages for loss of earnings;
3) The jury's award for past, present and future medical expenses is unsupported by the evidence;
4) The jury erred in finding that plaintiff was not a borrowed servant of Two "R" Drilling;
5) The jury erred in finding Arco negligent;
6) It was prejudicial error for the court to comment, in the presence of the jury, on the testimony of the toolpusher, Carroll Dufrene;
7) The trial court erred in qualifying J.D. Roberts as an expert;
8) The court's instruction to the jury on the borrowed servant issue was prejudicial to defendants; and
9) The court erred in refusing to admit evidence of plaintiff's prior criminal activity which was offered to rebut his claim of physical disability.

*808 III. APPELLATE STANDARDS OF REVIEW
This court has held that the manifest error standard of appellate review applies to claims brought under general maritime law. Cf. Osorio v. Watermans S.S. Corp., 557 So.2d 999 (La.App. 4 Cir. 1990), writs denied, 561 So.2d 99, 1004 (La.1990). Under the manifest error standard, an appellate court may not disturb a factfinder's findings of fact unless the record establishes that the factual findings are clearly wrong or manifestly erroneous. Rosell v. Esco, 549 So.2d 840 (La.1989). Where there is conflict in the testimony, reasonable evaluations of credibility, and reasonable inferences of fact should not be disturbed on appeal, even though the appellate court may feel that its own evaluations and inferences are just as reasonable. Rosell, supra. Where there are two permissible views of the evidence, the factfinder's choice of one cannot be manifestly erroneous or clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978).

IV. FINDING OF AN "ACCIDENT"
Further, when findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings because only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, supra at 844.
Defendants argue the jury erred in finding that plaintiff's injuries resulted from a one day exposure to non-toxic chemicals. Plaintiff and his co-employees testified to having respiratory problems while working in the tank. They further testified to fire emanating from the steam-cleaning machine and that plaintiff fell while climbing the ladder in an attempt to escape from the fire. Defendants relied upon the testimony of Two "R" Drilling employees, Carroll Dufrene and Dean Matherne, to establish that an accident did not occur. Dufrene and Matherne testified that they did not see any fire nor were they informed by the plaintiff and his co-employees that a fire had occurred. Dufrene did admit that plaintiff stated he had pulled a muscle in carrying a five gallon bucket. Dufrene further denied that the plaintiff and his co-employees requested respiratory equipment. However, both Dufrene and Matherne did acknowledge that Smith did have some type of incident on the rig, as an accident report was prepared, and a safety meeting held the day after the incident in question. Thus, in light of the conflicting testimony, we cannot say that the jury erred in finding that an accident did occur.

V. CAUSATION
Defendants further argue, that even if an accident did take place, there is no causation between the alleged incident and plaintiff's injuries. Defendants contend that the plaintiff was unable to prove at trial any connection between the work Smith performed the day in question and the injuries complained of. Plaintiff relied upon the testimony of his safety expert, J.D. Roberts, to argue that the cleaning fluid and diesel-based drilling fluid combined to create a toxic substance, which was inhaled by the plaintiff.
Defendants, in order to rebut the testimony of Mr. Roberts, produced their own experts: Ceramic Engineer Charles Perricone, Manager of Environmental Safety and Health with Purolator Products, James Skaggs, Industrial Hygiene expert Mark Wilson, and Dr. William George, a Toxicologist.
Plaintiff's expert, J.D. Roberts, referred to a data sheet on the fluid in the tank, diesel fuel oil # 2, which stated that "inhalation of excessive concentrations of vapor or mist can be irritating to the respiratory passages ...". He further noted that the cleaning agent used, CL-920, was a corrosive material which has a flash point of 109 degrees Fahrenheit. Roberts stated that in light of the fuel oil present in the tank and the cleaning agent used, persons involved in the cleaning of such a mud tank should wear slicker suits and use respirators. He stated that the failure to take these precautions, along with inadequate ventilation, creates an unsafe environment.
*809 Charles Perricone, defendant's expert in ceramic engineering, testified that no toxic gases would be present in a mud tank after the tank had been drained. He stated that the material left in a drained mud tank is a sludge of inert solids.
James Skaggs was qualified as an expert in the field of environmental health and the preparation of MSDS sheets. An MSDS sheet is a document which provides instructions on the precautions necessary for the proper use of toxic chemicals. Mr. Skaggs testified that if the cleaning agent CL-920 was correctly diluted 50 to 1, there should be no adverse health effects. It is should be noted that Mr. Skaggs had been employed at one time with ChemLink, the manufacturer of CL-920.
Mark Wilson, the defendant's expert in industrial hygiene, also concluded that the cleaning fluid, when used in its diluted form, is a non-hazardous material. He further testified that the drilling fluids present were inert.
Dr. William George, director of toxicology at Tulane University Medical Center, testified that he reviewed plaintiff's medical records and the types of substances allegedly present during the cleaning operation. Dr. George concluded that while some of the chemicals in the substance could cause short term irritation, the specific injuries complained of by the plaintiff could not be traced to a one-day exposure.
The jury has the discretion to accept or reject all or part of an expert witness' testimony. All of the defendants' experts recognized that although safe when properly diluted, the cleaning agent was hazardous in its concentrated form. There was no testimony from either side as to the actual dilution level of the cleaning agent used in the cleaning operations. Therefore, it is possible for the jury to have inferred from the testimony that the cleaning agent had not been properly diluted.

VI. MEDICAL TESTIMONY
Defendants further argue that the plaintiff failed to prove any medical causation between his alleged injuries and the incident in question. Plaintiff alleged at trial that he has suffered both physical and psychological injuries as a result of the accident. In particular, plaintiff testified to suffering from seizures, back problems, and pulmonary problems. He also has been diagnosed as having an impairment in his intelligence quotient and memory, as well as suffering from clinical depression.

A. PSYCHIATRIC INJURIES
To prove his psychological injuries, plaintiff relied upon the testimony of Dr. Raphael Salcedo, a psychologist, Dr. William Black, a neuropsychologist, and Dr. Richard Richoux, a psychiatrist. Dr. Black and Dr. Salcedo both testified that the tests they performed on the plaintiff indicate that plaintiff incurred an impairment of IQ and memory subsequent to the incident in question.
Dr. Richoux, who was Smith's treating psychiatrist, testified that the plaintiff suffers from severe depression. Richoux stated that the depression is a result of the incident as plaintiff is emotionally disturbed about what happened to him. Dr. Richoux further testified that plaintiff's psychiatric status remains poor because he is still suffering from the physical injuries incurred in the accident. Richoux opined that the plaintiff is not able to return to gainful employment, and is in need of continuing therapy. In fact, Richoux stated that the plaintiff should continue therapy twice a month for the rest of his life.
Plaintiff also suffers from seizures. Several witnesses to these seizures testified at trial. Dr. Daniel Trahant, a neurologist who treated the plaintiff, testified that the seizures are called pseudo-seizures because they have no organic basis but rather are emotionally induced. Trahant opined that Smith had suffered an emotional or psychological reaction to the incident in question. He stated that the accident was the cause of the plaintiff's condition.

B. SPINAL INJURY
Plaintiff was treated by Dr. Ralph Gessner for his back problems. Dr. Gessner first saw Smith on October 26, 1989. At *810 that visit, Smith complained of low back pain with pain radiating to the left leg. The physical exam was normal with no spasm present. Gessner ordered further tests to determine the cause of plaintiff's discomfort. X-rays and a catscan were normal but an EMG of the left leg showed some irritation of the left L-5 nerve. Dr. Gessner testified that plaintiff's injury could have resulted from the accident. Gessner also stated that Smith's back injuries may be a result of the seizures.

C. PULMONARY INJURY
Dr. Cathy Fontenot, an internist, treated the plaintiff for his pulmonary problems. Dr. Fontenot began seeing the plaintiff in September of 1988, at the request of a Dr. Miller. Dr. Fontenot diagnosed plaintiff as suffering from bronchospasm and reactive airways, which would make him more susceptible to inhaled irritants. Dr. Fontenot testified that plaintiff's condition is permanent and will require treatment for the rest of his life. She further stated that the irritants plaintiff inhaled in the mud tank probably caused plaintiff's condition.

VII. REBUTTAL MEDICAL TESTIMONY
In response to plaintiff's allegations of medical causation, defendants produced Drs. Leon Weisburg, Donald Adams, Richard Levy, and Hans Weil. Dr. Weisburg, a neurologist who examined plaintiff at the request of the worker's compensation carrier, testified that plaintiff's neurological examination was normal. Dr. Weisburg also performed a low back exam which was also normal. Dr. Weisburg concluded that the seizures plaintiff was having were pseudo-seizures as the seizures had no neurological basis. Weisburg stated that there was no direct relationship between the pseudo-seizures suffered by the plaintiff and the incident in question.
Dr. Donald Adams, another neurologist, also examined the plaintiff and found no abnormalities. He concluded that there was no neurological reason preventing Smith from returning to work. Dr. Richard Levy, a neurosurgeon who examined plaintiff in February 1990, also concluded that plaintiff did not have any neurological problems. Dr. Levy further stated that there was no reason why the plaintiff could not return to work.
Dr. Hans Weil, a pulmonary specialist, examined Smith on two occasions. He testified that he could find no medical basis for plaintiff's pulmonary complaints. He stated that there was no evidence of any obstructive airway disease nor was there any evidence of toxic exposure.
Thus, from a review of the medical testimony presented, it appears that the plaintiff produced sufficient evidence for the jury to conclude that the plaintiff had indeed incurred injuries as a result of his exposure. The record clearly establishes that plaintiff has been suffering from pseudo-seizures since the incident in question. While the medical evidence establishes that there is no organic basis for these seizures, the evidence clearly shows that the seizures were caused by the incident. Plaintiff's psychiatrist, Dr. Richoux, acknowledged the causation in his testimony. The defendants did not produce another psychiatrist to rebut Dr. Richoux's opinion. Further, as there was conflicting medical evidence as to the existence of plaintiff's pulmonary and lumbar problems, we can not say that the jury erred in finding that plaintiff did suffer pulmonary and back problems as a result of the accident.

VIII. EXCESSIVE AWARDS
Defendants further argue on appeal that the jury's awards for medical expenses and lost wages were excessive and speculative. Plaintiff did not produce an economist to testify as to his potential lost wages and earning capacity. The jury considered plaintiff's own testimony on his job history.

A. EARNING CAPACITY
Plaintiff testified at trial that he worked on trawling boats and oyster dredging boats making approximately $300.00 $450.00 per week. Smith also worked sporadically in the oil business, as a roustabout for Dimensional Oil Service and as a gauger for J.F.D. Oil Company. Smith *811 stated that he earned from $350.00 to $455.00 per week while employed as a gauger with J.F.D. At the time of the accident, plaintiff was making $6.00 an hour as a roustabout with Amigo.
Earning capacity is not necessarily determined by actual loss. Damages may be assessed for what the injured plaintiff could have earned despite the fact that he may not have yet realized that capacity. Hobgood v. Aucoin, 574 So.2d 344 (La. 1990); Folse v. Fakouri, 371 So.2d 1120 (La.1979); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Such damages are calculated on the person's ability to earn money rather than on what he actually earned before the injury. Hunt v. Bd. of Sup'rs of La. State University, 522 So.2d 1144 (La.App. 2nd Cir.1988).
Further, awards for lost future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2nd Cir.1984); Harris v. Pineset, 499 So.2d 499 (La.App. 2nd Cir. 1986), writs denied, 502 So.2d 114,117 (La. 1987).
Factors to be considered in determining a proper award for lost future income are the plaintiff's physical condition before the injury, the plaintiff's past work history and work consistency, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages over the remainder of his working life. Morgan v. Willis-Knighton Medical Center, supra; Cutchall v. Great American Pump Company, 460 So.2d 1106 (La.App. 2nd Cir.1984). Plaintiff's medical testimony establishes that he was totally and permanently disabled. He was awarded $34,300.00 for past wages consisting of minimum wage of $4.25 per hour times 40 hours per week times 44 months from the date of the accident to trial. Future lost wages of $290,700.00 represents minimum wage of $4.25 per hour for 40 hours per week or $8,500.00 annually times 34.2 years of worklife expectancy. The award is substantiated by those figures and no economist or expert was required to testify. The jury could have found that plaintiff's testimony and the above amounts were reasonable. Accordingly, the jury award of $325,000.00 in lost past and future wages is affirmed.

B. MEDICAL AWARD
The jury also awarded the plaintiff $250,000.00 for past, present, and future medical expenses. The jurisprudence is clear that a plaintiff must prove that future medical expenses will be incurred, even though such costs cannot be fixed with precision. Crowther v. Kmart Corp., 568 So.2d 669 (La.App. 4th Cir.1990) writ denied, 571 So.2d 656 (La.1990). Also, future medical expenses must be established with some degree of certainty. Awards for future medical expenses must be supported with medical testimony and estimation of probable costs. Gaspard v. Breaux, 413 So.2d 288 (La.App. 3rd 1982). The trier of fact is vested with much discretion in assessing damages, and absent an abuse of that discretion, the award will not be disturbed upon review. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Past medical expenses are $37,160.82. Future psychiatric care was established at $96,000.00 and $5,600.00 for pulmonary care. Plaintiff has an average life expectancy of 47.3 years. The testimony of his psychiatrist, neurologists, and orthopedist, support the jury's award for future medical expenses.
Dr. Fontenot, plaintiff's internist, testified that plaintiff's pulmonary condition was permanent requiring medication for the rest of plaintiff's life. Additionally, plaintiff is required to see his doctor regularly for this problem for the remainder of his life. Additional future medical expenses may be incurred by plaintiff if he suffers adverse side effects from the medication taken to control his pulmonary disorder. Dr. Fontenot testified that Smith would need to be examined at three month intervals for his pulmonary difficulties. Dr. Fontenot quoted a charge of $35.00 per *812 visit. Over a forty year period, the approximate total for such treatment would be $5,600.00.
Dr. Trahant, plaintiff's neurologist, testified that he has prescribed anticonvulsants to control plaintiff's seizures. Use of this medication suppresses the white blood count requiring blood monitoring every several months. If the white blood count is suppressed, the blood cells or liver may be damaged. Dr. Trahant also testified that the plaintiff would have to remain on the anticonvulsant, Tegretol, to control his seizures. No estimates were given on the costs of these medications.
Further, both physicians indicated that plaintiff could incur adverse side effects to these medications.
Dr. Richoux, plaintiff's treating psychiatrist, testified that the plaintiff would require therapy the rest of his life, or for approximately forty years, with visits every other week, which would come to a total of $96,000.00. The antidepressants cost $1.00 per pill and plaintiff takes one every day. Because of plaintiff's suicidal tendencies, there is a likelihood that plaintiff could be rehospitalized in a psychiatric hospital in the future costing approximately $3,500.00 a week.
Dr. Gessner, plaintiff's orthopedist, testified that the L-5 disc is problematic and requires further testing before he can determine whether surgery is needed.
All of the medical factors discussed above were considered by the jury when considering its award for medical expenses. It does not appear that the jury abused its discretion in awarding $213,000.00 in future medical expenses and $37,160.82 in past medical expenses.
Amigo's worker's compensation carrier, Aetna, submitted into evidence at trial records that revealed it had paid out $37,160.82 in past medical expenses on behalf of the plaintiff.

IX. BORROWED SERVANT
Defendants further assign as error the trial court's instruction on the borrowed servant issue, and the jury's finding that the plaintiff was not a borrowed servant of Two "R" Drilling. The record indicates that the court's substantive instruction to the jury correctly followed the applicable law. Defendants also acknowledge this in their brief. Defendants, however, assign as error the following statement made by the court immediately after the borrowed servant instruction was given:
If under the facts of this case, you find that plaintiff meets the legal criteria of being a "borrowed servant," then he is not entitled to collect any damages from the defendants. If you find that plaintiff was not a "borrowed servant," you may award him damages if he has proved any by a preponderance of the evidence.
The trial record does not indicate that the defendants objected to this portion of the jury instruction. L.S.A.-C.C.P. article 1793 requires that a party object to an error in instruction as a prerequisite to bringing it up on appeal. Defendants, as the appellants in this matter, have the obligation to insure that the appellate record is complete. Since the record does not reveal that defendants objected to the jury instruction at trial, defendants are barred from asserting as error that the jury instruction was erroneous and prejudicial. Pitts v. Bailes, 551 So.2d 1363 (La.App. 3rd Cir.1989), writs denied, 553 So.2d 860 (La. 1989), 556 So.2d 1262 (La.1990).
Defendants argue on appeal that the evidence adduced at trial clearly reveals that Smith was a borrowed servant of Two "R" Drilling. The factors to be considered in determining whether a particular employee becomes a borrowed servant are:
(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
(2) Whose work is being performed?
(3) Was there an agreement, understanding, or meeting of the minds between the original and borrowing employer
(4) Did the employee acquiesce in the new work situation? *813 (5) Did the original employer terminate his relationship with the employee?
(6) Who furnished the tools and place for performance?
(7) Was the new employment over a considerable length of time?
(8) Who had the right to discharge the employee?
(9) Who had the obligation to pay the employee?
Ruiz v. Shell Oil Co., 413 F.2d 310, 313 (5th Cir.1969).
The most determinative factor in determining the issue of borrowed servant is the control issue. Capps v. N.L. Baroid-N.L. Industries, Inc., 784 F.2d 615 (5th Cir.1986) cert. denied, 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 83 (1986). There is a presumption that the general employer retains control over the employee. In order for the employee to be considered to be a borrowed employee of the special employer, it must be shown that the relationship between the general employer and his employee had been suspended and that a new relationship had been created between the employee and the special employer. Marzula v. White, 431 So.2d 858 (La.App. 2nd Cir. 1983). The party who alleges that an employee has become a borrowed servant has the burden of proof on that issue. Brumbaugh v. Marathon Oil Co., 507 So.2d 872 (La.App. 5th Cir.1987) writ denied, 508 So.2d 824 (La.1987).
In the present case, there is no question that the work being performed was undertaken by Two "R" Drilling. It was Two "R" Drilling's contracted rig that was being cleaned. Smith and his co-employees had been instructed in their duties by Carroll Dufrene, Two "R" Drilling's toolpusher. Dean Matherne, Two "R" Drilling's derrickman, gave plaintiff and the other Amigo workers instructions on the use of the steam-cleaning machine and the cleaning of the mud tanks.
However, Two "R" Drilling did not have the obligation to pay Smith. The plaintiff received his wages from Amigo. Further, there is no evidence that Amigo terminated its relationship with the plaintiff once he began the work for Two "R" Drilling. Nor is there any evidence that Smith acquiesced in the new work situation. There was also some inconsistent testimony as to whether Amigo had a supervisory employee on board. Defendants contend that there was no supervisor or foreman in the Amigo crew. Plaintiff argues that Larry Chaupetta was plaintiff's immediate supervisor with Amigo. Considering the lack of clarity in the evidence presented on this issue, we cannot say that the jury committed manifest error in finding that the plaintiff was not a borrowed servant of Two "R" Drilling.

X. ARCO'S LIABILITY
Defendants' next assignment of error concerns the jury's finding that Arco Oil Company was negligent. Defendants argue that the jury's finding was manifestly erroneous as there was no evidence of Arco's involvement in the incident sued upon. Arco, the rig owner, contracted with Two "R" Drilling to perform drilling operations. Two "R" Drilling was the contractor of the rig and mud tank on which plaintiff was allegedly injured. According to the defendants, Arco's only involvement was the presence of its employee, Kenneth Martin. Martin's function on the rig was solely to monitor the progress of the work being performed. Thus, under the jurisprudence established in Wallace v. Oceaneering International, 727 F.2d 427 (5th Cir.1984), defendants argue that Arco cannot be held liable. In Wallace, the court held that "a principal, such as [an oil company], who hires independent contractors over which he exercises no operational control has no duty to discover and remedy hazards created by its independent contractors." Id., at 437.
Plaintiff, however, argues that Wallace is inapplicable as Martin was responsible for the safety procedures utilized on the rig. Plaintiff relies upon the testimony of Carroll Dufrene, Two "R" Drilling's toolpusher to support his argument. Mr. Dufrene testified at trial that Martin had hired the person whose duty it was to check the concentrations of various gases in the mud tanks on the day of the incident.
*814 Dufrene further stated that Martin directly supervised this person. Hence, the involvement of Martin and Arco involvement was not merely passive. Martin's active supervision of the safety procedures utilized on the rig opens the door for Arco's potential liability. The jury was within its discretion in finding Arco liable, as the jury could infer from the testimony presented that there was negligence on the part of Martin in his supervision of the safety procedures.

XI. PREJUDICIAL REMARKS BY THE TRIAL JUDGE
Arco and Two "R" Drilling contend on appeal that the trial judge made prejudicial remarks concerning the testimony of Carroll Dufrene in the presence of the jury. L.S.A.-C.C.P. article 1791 provides that
The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved or related.
However, "the reasons given by a trial judge in a jury's presence for his rulings or objections, for admitting or excluding evidence, or explaining the purpose for which evidence is offered or admitted, are not objectionable as comments or expressions of an opinion on the evidence provided they are not unfair or prejudicial to the party complaining." Calhoun v. Federated Rural Elec. Ins., 571 So.2d 672 (La.App. 3rd Cir.1990) writ denied, 577 So.2d 14 (La. 1991), citing Oh v. Allstate Ins. Co., 428 So.2d 1078 (La.App. 1st Cir.1983).
A review of the trial transcript reveals that the comments of which defendants complain were simply the trial judge's manner of admonishing defense counsel for leading their own witnesses and making improper objections. Thus the remarks made by the trial judge do not constitute reversible error.

XII. EXPERT QUALIFICATIONS
Defendants further argue on appeal that the trial court erred in qualifying J.D. Roberts as an expert witness. Mr. Roberts was qualified by the court as an "expert in safety, particularly in contained spaces."
The trial court has great discretion in deciding which witnesses are qualified as experts, and the breath and scope of expert testimony. La.C.E. art. 702; Armstrong v. Lorino, 580 So.2d 528 (La.App. 4th Cir. 1991), writ denied, 584 So.2d 1166 (La. 1991). The Louisiana Code of Evidence allows the use of expert testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue ...". La.C.E. article 702. Absent a showing of manifest error, the ruling of the trial court qualifying a witness as an expert will not be disturbed on appeal. Prather v. Caterpillar Tractor Co., Inc., 526 So.2d 1325 (La.App. 3rd Cir. 1988) writ denied, 531 So.2d 272 (La.1988).
In the present case, the issues before the jury included whether sufficient safety precautions were taken by the defendants. Mr. Roberts was allowed to testify, on plaintiff's behalf, as to the standard safety procedures utilized in contained spaces, particularly in regards to mud tanks and the like. Roberts is a professional safety consultant, with an associate's degree in safety technology. He has been engaged in the field of occupational safety since 1968, and is involved primarily in the maritime and construction industries. Roberts testified that he has been certified by ASCP with a specialty in safety management. He has also been certified as shipyard competent in confined areas by the National Fire Protection Agency and the Department of Labor.
A lay person does not have the knowledge of the standard safety procedures utilized in the oil field industry. The jury was entitled to and needed such specialized knowledge to make a fair determination of the duties of the parties involved. Thus, there was no error in the trial court's decision to qualify Roberts as a safety expert. Furthermore, if the jury found Mr. Roberts' qualifications and expertise insufficient, the jury had been properly instructed *815 that they could totally disregard his testimony.

XIII. EVIDENCE OF PRIOR CRIMINAL ACTIVITY
Defendants also argue the trial court erred in refusing to admit evidence of plaintiff's prior criminal activity. Defendants argue that this evidence was to be offered to rebut plaintiff's claim of physical disability. The convictions in question were several misdemeanor convictions plaintiff received in 1989 and 1990. La. C.E. article 609 precludes the use of misdemeanors in attacking the credibility of witnesses in civil cases. Defendants argue that the misdemeanor convictions were not to be used to attack plaintiff's credibility on the basis that he is a dangerous criminal, but to show that plaintiff had been involved in strenuous activities subsequent to the accident. Defendants rely on La.C.E. article 607(D) in their argument. They contend that plaintiff's convictions are extrinsic evidence whose probative value is not outweighed by the risk of prejudice in that the convictions would should that the plaintiff was not physically disabled.
Louisiana Code of Evidence article 607(D) provides in pertinent part,
Except as otherwise provided by legislation:
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
Article 609 precludes the use of misdemeanor convictions as a basis for attacking a witness' credibility in civil cases. Accordingly, the trial court did not err in refusing to admit evidence of plaintiff's misdemeanor convictions.

XIV. PREJUDGMENT INTEREST
Plaintiff also sought review of a denial of prejudgment interest. Prejudgment interest under general maritime law may be awarded at the discretion of the trier of fact. In a jury trial, the issue of prejudgment interest must go to the jury. Havis v. Petroleum Helicopters, Inc., 664 F.2d 54 (5th Cir.1981); Ellender v. Texaco, Inc., 425 So.2d 291 (La.App. 3rd Cir.1982). In the present case, plaintiff did not submit an interrogatory to the jury requesting prejudgment interest.
Louisiana Code of Civil Procedure article 1812 provides in pertinent part,
If the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue omitted unless, before the jury retires, he demands its submission to the jury. As to an issue omitted without such a demand the court may make a finding, or if it fails to do so, it shall be presumed to have made a finding in accord with the judgment on the special verdict.
All issues in the present matter were submitted to the jury. Thus, plaintiff's failure to request that the issue of prejudgment interest be submitted to the jury precludes an award for prejudgment interest. The trial judge, as he was not the trier of fact, had no authority to grant an award of prejudgment interest. Cf. Morales v. Garijak, Inc., 829 F.2d 1355 (5th Cir.1987); Forbes v. A & P Boat Rentals, Inc., 689 F.Supp. 625 (E.D.La.1988); Turner v. Inland Tugs Co., 689 F.Supp. 612 (E.D.La.1988). Accordingly, the trial judge did not err in denying plaintiff's request for prejudgment interest.

XV. LEGAL INTEREST & COSTS
Intervenor, Aetna Casualty and Surety Company, also appealed seeking legal interest and costs on the award for reimbursement of worker's compensation benefits paid to the plaintiff. Aetna argues that as the prevailing party it is entitled to all costs citing LSA-R.S.13:4533, which provides as follows:

*816 The costs of the clerk, sheriff, witness' fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs.
R.S.13:4533 merely defines what is meant by the term "costs". It does not discuss who is entitled to costs and under what circumstances.
C.C.P. Art. 1920 provides:
Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
Thus, under general civil law, the question of awarding costs is discretionary with the trial judge, except as otherwise provided by law. Accordingly, we will specifically examine the Worker's Compensation law.
LSA-R.S. 23:1317 B as amended by Acts 1983, 1st Ex.Session, No. 1 § 1, effective July 1, 1983 provided as follows:
Costs may be awarded by the court, in its discretion, and when so awarded the same may be allowed, taxed, and collected as in other civil proceedings ...
LSA-R.S. 23:1320 added by Acts 1983, 1st Ex.Sess., No. 1 § 1, effective July 1, 1983 provides:
If the court, before which any proceedings for compensation or concerning an award for compensation have been brought, determines that the proceedings have not been brought upon reasonable grounds, it shall assess the whole cost of the proceedings against the party who has brought the proceedings.
In each of the statutes examined thus far, the question of awarding costs lies within the sound discretion of the hearing officer or of the court. Thus under both the general civil provisions and the specific Worker's Compensation statutes, grants of costs are discretionary with the court or hearing officer.
Aetna argues that as the prevailing party it is entitled to costs. Aetna confuses state and federal law. Federal Rule of Civil Procedure 54(d) provides that "... costs shall be allowed as of course to the prevailing party unless the court directs otherwise". There is no similar provision at state law. The court in the instant case was within its discretion in not awarding costs. Accordingly, this specification of error is without merit.
In addition to the cost argument, Aetna argues that the trial court erred in failing to award legal interest citing King v. Louviere, 524 So.2d 65 (La.App. 3rd, 1988) aff'd, 543 So.2d 1327 (La.1989). Accordingly, we amend the judgment to grant legal interest to Aetna from date of judicial demand and as amended, affirm the judgment.
For the reasons discussed, the judgment of the district court is amended and, as amended, is affirmed.
AMENDED & AFFIRMED.