PLOTKIN, Judge.
Plaintiff Joseph F. Pradarits appeals a trial court judgment dismissing his Jones Act and general maritime law claims arising out of injuries allegedly incurred when he slipped between two barges while performing his duties as a tankerman in the employ of defendant Capital Towing Corporation. Pra-darits’ claims alleging negligence and unseaworthiness were denied by the trial court. We affirm.
I. Facts
Pradarits, who was an experienced tanker-man, began working for Capital in April of 1991. Prior to his employment with Capital, he had allegedly suffered a torn muscle in his right arm in September of 1988, while working for another towing company. Thereafter, sometime in November of 1991, while Pra-darits was working aboard a Capital push-boat, the TED B, he allegedly tore a muscle near his rib cage while performing his tank-erman duties. Thereafter, on January 3, 1993, Pradarits allegedly suffered injuries to his leg, hip, buttocks, and groin area |2when he fell between two barges. Those injuries form the subject of the instant suit.
The fall in question occurred while Pradar-its was participating in a clean-up operation in response to the spill of product during an off-loading operation at a Marathon Oil docking facility. At the time of the spill, Pradar-its was the tankerman on duty. The offloading operation being performed involved the unloading of two barges simultaneously. Pradarits was working on the exterior barge during the operation. He testified that he started the pump on his barge when he received the signal to do so from the tanker-man on the inside barge; then he went to work on some equipment at another location on the barge. Pradarits testified that he was not aware that the spill had occurred until the other tankerman signaled him. By that time a large amount of product, a heavy oily substance, had run out on the deck of the barge. Pradarits admitted at trial that he may not have been following company procedure in performing his off-loading duties.[1]
A clean-up procedure was instituted, involving most of the crew members who were working on the pushboat at the time of the spill. Pradarits’ responsibility was to carry 50 pound bags of “Stay Dry” from the interi- or barge to the exterior barge, where he stacked it up so that other members of the crew and people working on the clean up could retrieve the “Stay Dry” and spread it-in the area where the spill had occurred. However, at the time of the fall, Pradarits was not carrying anything. He testified at trial that he simply lost his footing while crossing back to the interior barge to retrieve another bag of “Stay Dry.” No one witnessed the accident.
l3Pradarits filed suit against Capital Towing, inter alia, alleging that his injuries resulted from both unseaworthiness and negligence. Following trial, the district judge dismissed Pradarits’ action at his cost, stating in his reasons for judgment as follows:
Plaintiff was solely responsible for the safe discharge of the barge. His complaint *337 that the standard operating procedure could not be handled by one man is not persuasive. He could and should have monitored the flow of oil, watched the pressure gauge and the hose connections. He should not have engaged his pump until the inboard barge had been discharging for 30 minutes.
The crew was not short-handed and his partial disability, if factual, had absolutely nothing to do with the accident.
Pradarits appeals.
II. Unseaworthiness claim
Generally, a vessel owner has an absolute duty to provide a vessel which is “reasonably fit for its intended use.” Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). “A vessel is unseaworthy unless all of its appurtenances and crew are reasonably fit and safe for their intended purposes.” Foster v. Destin Trading Corp., 96-C-0803, (La.1997), 700 So.2d 199, 202. The vessel owner’s burden to provide its crew with a seaworthy ship is absolute. See id. This duty is completely independent of the Jones Act requirement to exercise reasonable care. See id. Unseaworthiness may exist regardless of the vessel owner’s fault or knowledge. Foster v. Destin Trading Corp., 96-C-0803, (La.5/30/97), 700 So.2d 199, 202. However, “[t]he standard is not perfection, but reasonable fitness.” Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960).
pradarits’ claim that the pushboat TED B was unseaworthy at the time of the accident which caused his injuries is based on two contentions: (1) that the pushboat had an insufficient crew at the time of the accident, and (2) that he personally was unfit to perform his duties.
A. Sufficiency of the crew
A vessel must be manned with a crew sufficient in competencies and numbers to handle any situation which might be encountered. A failure to supply a vessel with a crew both adequate in number and competent in duties constitutes a “classic case” of unseaworthiness. June T. Inc. v. King, 290 F.2d 404 (5th Cir.1961).
In the instant case, all of the witnesses who testified at trial agreed that, on January 3,1992, the TED B was manned by five men: one captain, one pilot, two tankerman (including Pradarits), and one deck hand. Pra-darits claims that crew was insufficient because a full crew typically included two deck hands: one for each watch. Thus, Pradarits claims, an additional deck hand should have been assigned to the tug.
We find no merit in Pradarits’ contention on this issue. Pradarits cites no authority for his claim that the crew of a pushboat such as the TED B should consist of a captain, relief captain, tankerman first watch, tankerman second watch, deck hand first watch, and deck hand second watch. Moreover, Capital owner, Van H. Burkhart Jr. testified that only five crew members were necessary. Donald Garza, the other tanker-man on board the TED B at the time of the spill, supported Burkhart’s testimony, stating at trial that the pushboat had a full crew at the time of the accident. Only one deck hand was a part of the “usual crew complement,” he said.
| sAdditionally, in order to prove unseaworthiness, a plaintiff must show that the unseaworthy condition was the proximate cause of his injury. See Johnson v. Offshore Express, Inc., 845 F.2d 1347 (5th Cir.1988). Nothing in Mr. Pradarits’ brief or in the record shows that the absence of an additional deckhand had anything to do with Mr. Pradarits’ injury. Thus, even if Pradarits’ claim that the crew was insufficient at the time of the accident is true, it is insufficient to render the TED B unseaworthy.
B. Pradarits’fitness
Several courts have held that the presence of certain crew members aboard the vessel may create an unseaworthy condition. In Miles v. Melrose, 882 F.2d 976, 981 (5th Cir.1989), aff'd 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), the court stated as follows: “Just as a dangerous mast, a defective line, or a damaged hull may render a vessel unseaworthy, so may a seaman who is not reasonably fit.” In order to prove that a particular crew member was unseaworthy, the plaintiff must establish that the crew *338 member was not “equal in disposition and seamanship to the ordinary men in the calling.” Id.
Pradarits’ primary contention concerning the seaworthiness of the TED B at the time of the accident was that his employment rendered the pushboat unseaworthy. Specifically, Pradarits claims that because of the prior injuries he had sustained before and while working for Capital, his own presence aboard the vessel resulted an unseawor-thy condition. Pradarits also claims that Capital improperly required him to perform the full duties required of a tankerman when Capital allegedly knew that Pradarits was capable only of light duties. When the accident occurred on January 3, 1992, Pradarits claims that he had been wearing his arm in a sling as a result of his November injury.
ftPradarits’ claim that he was physically limited by his prior injury sustained aboard the TED B is itself questionable. The Capital physician and Pradarits’ fellow crew members testified that Pradarits appeared capable of performing his tankerman duties. Moreover, those working with Pradarits aboard the TED B, as well as the Capital physician, refuted his assertion that he had been wearing his arm in a sling as a result of the November 1991 accident aboard the TED B. Finally, nothing in the Capital physician’s medical reports suggests that Pradarits was restricted to light-duty work at the time of the accident. We echo the trial court’s doubts regarding Pradarits’ purported inability to perform.
Although the presence on board of an unfit seaman is sufficient to render a vessel unseaworthy, a study of the jurisprudence indicates that that rule is strictly limited. For example, in Miles, the mother of a crewman killed at sea alleged that the vessel upon which her son had been working at the time of his death was unseaworthy because of the presence of a fellow seaman who stabbed her son. See 882 F.2d 976 The court found that the violent seaman was unseawor-thy, stating as follows: “[a] seaman ... fails to meet the seaworthy standard only if he possesses a savage and vicious nature.” Id. at 981.
Moreover, in a case with facts similar to the case at hand, Carver v. Partlow Corp., 344 F.2d 932 (5th Cir.1965), the cornet found that the presence of an injured seaman did not render the vessel unseaworthy. In Carver, a chef steward was wearing his arm in a sling as a result of an injury incurred prior to the time of the accident that injured him. However, the steward continued to perform light housekeeping duties upon the vessel and was carrying a garbage pail when he slipped and injured himself. Id. The steward claimed that the vessel was unseaworthy because he was required to perform his duties while in a partially-disabled condition. Id. The court held that the vessel was not unsea-worthy ^“because the vessel was in port, requiring only routine housekeeping duties of appellant, and because appellant’s original sprain was not of sufficient gravity to prevent him from performing such duties.” Id. at 932.
Pradarits seeks to distinguish his situation from the situation in Carver, claiming that, unlike the steward in Carver, he was required to perform the laborious tasks of a tankerman. Pradarits notes that, despite the fact that his arm was in a sling, he was required to perform the off-load operations, which necessitated some contortion of his body. Moreover, Pradarits claims that he was required to respond to emergency situations such as the spillage that occurred aboard the barge, by carrying and maneuvering fifty-pound bags of absorbing materials.
Despite the differences between Pradarits’ situation and the situation in Carver, we find no error in the trial court judgment dismissing Pradarits’ seaworthiness claim. The trial court found that none of the requirements of Pradarits’ job caused his injury. Even if a particular crew member is proven to be an unseaworthy condition, the plaintiff is still required to show that the unseaworthy condition caused his injury. “To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.” Johnson v. Offshore Express, Inc., 845 F.2d 1347 (5th Cir.1988).
*339 Pradarits does not explain how his alleged physical limitations and his supposed inability to perform his duties resulted in his fall. The record supports the trial court’s finding that Pradarits’ failure to follow mandatory off-loading procedures, coupled with his inattention, was the sole cause of the spill. In | ¡¡addition, even if Mr. Pradarits was suffering from an injury that prevented him from aiding fully in the cleanup operation, Mr. Pradarits was not carrying the heavy bags of absorbing material at the time of his fall nor did he appear to be performing any duties that would have been impaired by a purported shoulder injury. For these reasons, the trial court’s conclusion that Pradarits’ alleged injury had nothing to do with his fall is not manifestly erroneous. Courts have previously declined to adopt a new rule “which would allow recovery for a condition of temporary unseaworthiness deliberately brought about without the ship owner’s or captain’s knowledge, by the same seaman who then injures himself upon the very defect he intentionally creates.” See Little v. Green, 428 F.2d 1061, 1067 (5th Cir.1970), cert. denied 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970).
Accordingly, the trial court judgment dismissing Pradarits’ unseaworthiness claim is affirmed.[2]
III. Negligence claim
“An employer’s negligence may arise from a dangerous condition on or about the vessel, failure to use reasonable care to provide a seaman with a safe place to work, failure to inspect the vessel for hazards and any other breach of the owner’s duty of care.” Foster v. Destin Trading Corp., 96-C-0803 (La.5/30/97), 700 So.2d 199, 205. A seaman’s burden of proving his employer’s negligence is “feather light.” Id.
Pradarits’ negligence claim against Capital is based on his contention that Capital negligently hired him. Pradarits claims that he was hired by Capital |9without question because of his connections with his sister’s fiance, William Wilkerson, a captain for Capital, and his relationship with Capital’s office manager and port captain, Don Brock. At trial, Pradarits admitted to falsely answering questions related to his previous injuries and felony record, including prison time, on his employment application Pradarits argues that Brock was nevertheless aware of the past criminal record and his past injuries. Based on this unique argument, Pradarits claims that Capital was negligent in hiring him.
However, Pradarits neglects to explain how such negligent hiring, even if true, caused his accident and resulting injury. A seaman is obligated to act with ordinary prudence under the circumstances. See Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5th Cir.1997). Pradarits admitted that his failure to follow proper discharge procedures may have been the sole cause of the spill. Moreover, one of Pradar-its’ fellow crew members saw Pradarits running on the barge shortly before his fall. As the trial court found, these circumstances were the culprits causing Pradarits’ fall. If anyone was negligent in causing Pradarits’ injuries, it was Pradarits himself.
Moreover, nothing in the record shows that Pradarits’ alleged physical limitations resulting from his previous employment, if existent, prevented him from performing his assigned tasks. Pradarits had been working for Capital for more than seven months prior to the accident in question. During that time, Pradarits’ alleged disabilities had not prevented him from performing successfully any of the duties required of a tankerman.
Accordingly, we find no manifest error in the trial court judgment dismissing Pradar-its’ negligence claims.
lioIV. Conclusion
We affirm the trial court judgment dismissing Pradarits’ unseaworthiness and negligence claims. Thus, we pretermit discussion of Pradarits’ comparative negligence claims.
AFFIRMED.

. Mr. Pradarits conceded at trial that a second barge is not to be discharged until the first has been pumping normally for a minimum of thirty minutes. Mr. Pradarits admitted that he was responsible for the barge and that, if the signal to discharge the second barge was given in less than thirty minutes, he violated company policy.

. Because we find that Mr. Pradarits' presence aboard the TED B did not render the vessel unseaworthy, we do not address whether a seaman may ever recover under an unseaworthiness claim when his own disability or incompetence causes his injury.