733 So.2d 1240 (1999)
Lee SELICO
v.
INTERCONTINENTAL BULKTANK CORPORATION, et al.
No. 98-CA-0763.
Court of Appeal of Louisiana, Fourth Circuit.
May 12, 1999.
*1241 Walter Z. Steinman, Charles P. Neely, Wyncote, Pennsylvania, Attorneys For Plaintiff/Appellee Lee Andre Selico.
Gerard T. Gelpi, G. Beauregard Gelpi, Gelpi, Sullivan, Carroll & Gibbens, New Orleans, Louisiana, Attorneys for Defendants/Appellants Intercontinental Bulktank Corporation and Maritime Overseas Corporation.
Court composed of Judge WILLIAM H. BYRNES III, Judge STEVEN R. PLOTKIN and Judge PATRICIA RIVET MURRAY.
PATRICIA RIVET MURRAY, Judge.
International Bulktank Corporation and Maritime Overseas Corporation appeal a judgment in favor of seaman Lee Selico based on negligence and unseaworthiness as well as a judgment notwithstanding the verdict awarding Mr. Selico pre-judgment interest on the award for damages caused by unseaworthiness. We affirm.

*1242 FACTS:
On May 28, 1987, Lee Selico, a merchant seaman, was employed by International Bulktank Corporation (IBC) aboard the M/V Overseas Alaska, a steam tanker, as a "deck engine utility." On that date the ship was docked in the port of New Orleans undergoing an annual coast guard inspection. Mr. Selico was working in the engine room under the supervision of the first and second assistant engineers while the coast guard officers were inspecting the boiler. He had followed the second assistant engineer, as instructed, to the top of the boiler in order to put a "gag" on the steam valve so that the boiler could be raised to capacity in order to be inspected. Mr. Selico and the engineer had climbed a catwalk onto the slanted side of the boiler, and Mr. Selico followed in order to assist him. The engineer realized that he needed more tools in order to complete gagging off the valve, and asked Mr. Selico to return to the machine shop for them. Mr. Selico testified that he turned around and went back the way he had come, but he slipped and lost his footing. He reached for the hand railing in order to catch himself, and pulled his shoulder out of place. The second engineer picked him up vertically, and stood him on the catwalk, then called for the first engineer who helped get Mr. Selico to the lower engine room where they were able to work his shoulder back into place with some effort after approximately a half hour. Mr. Selico testified that his fall was caused by a combination of the slant of the top of the boiler and the build-up of soot and moisture on its surface.
When asked by the medical officer, who had been called by the engineer, if he wanted to continue working, Mr. Selico replied that he needed to keep his job. He indicated to the officer that he did not need to see a doctor at that time. He testified that he was told that he should ask for treatment later if he felt it was needed.
Mr. Selico continued to work for approximately two weeks. Although he was not doing anything too strenuous, he continued to have problems with his shoulder, which remained sore. On approximately June 14 or 15 Mr. Selico was working in the engine room, and reached for some tools. When he did so he felt as if his shoulder was going to come out of place again, and realized that he needed medical attention. He advised the mate that it did not appear that his shoulder was getting better from the injury on May 28, and he asked to see a doctor. The mate filled out a requisition for medical attention, and Mr. Selico was taken to a doctor in New York. Mr. Selico gave the doctor the history of the accident on May 28. He also gave a history of a football injury to his shoulder in high school, as well as two or three other occasions when his shoulder "popped out" out of place, the most recent having occurred approximately two years before this accident. Following an examination and xray, the doctor determined that Mr. Selico was not fit for duty. Mr. Selico returned to the ship, and arrangements were made for him to return to New Orleans.
On June 19, following his return to New Orleans, Mr. Selico consulted Dr. Walter Brent, an orthopedic surgeon. Dr. Brent diagnosed a dislocating left shoulder. He was of the opinion that Mr. Selico had a severe rotator cuff injury, and recommended surgery to form a new anterior part of the rotator cuff. As Dr. Brent explained, the procedure would involve exposing the shoulder joint, taking out the labrum (cartilage attached anteriorly), freshening the bone on the anterior of the labrum, and placing the glenoid cavity of the shoulder joint tightly on the "freshened up" bone so that it would heal in this position. He also recommended that the muscles be plicated back and tightened slightly in front of this area.
Dr. Brent performed the surgery on June 25. The surgery disclosed that the anterior capsule and the labrum were completely torn from the anterior part of the *1243 attachment of the glenoid, which Dr. Brent found was consistent with trauma caused by a recent injury. In his opinion this most likely happened as Mr. Selico grabbed onto something and received a severe jerk when he attempted to break his fall in the engine room.
Mr. Selico remained in the hospital for nine days and was seen by Dr. Brent on several occasions following his discharge. He began physical therapy in mid-July and was discharged by Dr. Brent on November 9, 1987. At that time Mr. Selico lacked approximately fifteen degrees external rotation and approximately five degrees internal rotation of the shoulder. Dr. Brent felt that this was an excellent result. Although he assigned a ten percent partial disability of the upper extremity, he opined that Mr. Selico could return to his work as a merchant seaman. Mr. Selico returned to this work on December 6, 1987.
Following testimony by Mr. Selico and Dr. Brent, and the introduction of various exhibits, the plaintiff rested. The trial court denied a defense motion for directed verdict. The defendants then rested without calling any witnesses.
The jury answered interrogatories finding that: the Alaska was unseaworthy on May 28, 1987, and the unseaworthiness was a proximate cause of injuries to Mr. Selico; that Maritime Overseas Corporation and International Continental Bulktank Corporation were negligent on May 28, 1987, and their negligence contributed to the injury sustained by Mr. Selico; that 50% of Mr. Selico's injuries were attributable to unseaworthiness and 50% to negligence; that Mr. Selico's lost wages were $17,845.01, and his past, present and future suffering, disability, mental anguish and loss of capacity for enjoyment of life was $125,000.00; that he was not negligent in a manner that contributed to his injuries; and that Mr. Selico was not entitled to recover pre-judgment interest.
The court entered judgment in accordance with the verdict on October 17, 1997. On December 19, 1997, the court granted Plaintiffs Motion for Judgment Not Withstanding the Verdict and awarded prejudgment interest as to one-half of the lost wage award and one-half of the damage award.
The defendants have appealed assigning three errors by the trial court: 1) the court erred in awarding plaintiff pre-judgment interest; 2) the jury's findings of negligence and unseaworthiness are not supported by the evidence; and 3) the jury erred when it failed to find Mr. Selico to be contributorily negligent.

DISCUSSION:
Defendants do not take issue with the charges given the jury, but contend that the evidence does not support the findings of negligence and unseaworthiness. They argue that the only evidence presented by the plaintiff on these issues was that the top of the boiler was slanted and that there was moisture and soot on it, and these facts are not sufficient to carry the plaintiffs burden to prove either negligence or unseaworthiness. We disagree.
Mr. Selico testified that he was performing a task that he had never done before, gagging the safety valves on the top of the boiler, under the supervision of his superior officers. He testified that the boilers are approximately thirty feet above the deck of the engine room. The top of the boilers is a slanted surface that Mr. Selico had never been on prior to this accident. He testified that this was not a normal work surface, and that the top of the boiler was not regularly cleaned. The surface had not been cleaned in order to make it a safe place to work prior to Mr. Selico's being taken, by his superior, to the top of the boiler to work on the valve. Mr. Selico testified that he inspected the top of the boiler as a result of questioning by defendants' attorney, and observed skid marks and footprints in the area where he had fallen; he had not seen anyone on top of the boiler from the date of his accident until he made his inspection. He concluded, *1244 therefore, that the skid marks and footprints were associated with his accident.
Defendants elected not to call any of the crew members who were present on May 28, 1987, when Mr. Selico slipped on the top of the boiler and caught himself, pulling his shoulder out of its socket. Instead, defendants cross-examined Mr. Selico with regard to his failure to mention the soot or moisture on the top of the boiler when he gave a statement to their counsel prior to leaving the ship in New York.
Under the general maritime law a vessel owner has an absolute duty to keep and maintain the ship, its decks, passageways, appliances, gear, tools and equipment in a seaworthy condition at all times. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). A vessel is seaworthy if it and its appurtenances are reasonably fit for their intended use and its crew is reasonably adequate. If a vessel and its appurtenances are not safe and suitable for their intended use then the vessel is unseaworthy. Id. In order for a shipowner to be liable based on a claim of unseaworthiness a plaintiff must prove that the unseaworthy condition was a substantial factor in causing his injury. Foster v. Destin Trading Corp., 96-0803 (La.5/30/97), 700 So.2d 199; Pradarits v. Capital Towing Corp., 97-2077 (La.App. 4 Cir. 3/11/98), 710 So.2d 334.
The jury apparently believed Mr. Selico's testimony that his fall was caused by a combination of the soot and moisture on the top of the boiler and the fact that the surface upon which he was required to walk to perform the task assigned to him was slanted. It likewise appears to have accepted his explanation, on cross-examination, as to why he did not mention the soot and moisture in his statement to defendants' attorney. This was a credibility determination to be made by the jury, and we find that it is supported by the record. Smith v. Two R Drilling Co., Inc., 606 So.2d 804, 808 (La.App. 4th Cir.), writ denied 607 So.2d 560 (La.1992).
The top of the boiler was not fit to serve as a walkway or a work platform for a seaman assigned to perform the task to which Mr. Selico was assigned. The jury's conclusion that the Alaska was unseaworthy and that this condition was a contributing cause of Mr. Selico's injury is supported by the record and must be affirmed.
Likewise, the jury's finding of negligence is supported by the record and must be affirmed. Under the Jones Act, an employer has a duty to provide a seaman with a safe place to work. If it breaches that duty, and that breach plays a part in causing injury to the seaman, the employer is negligent. See Foster, supra at p. 3, 700 So.2d at 208.
Mr. Selico testified that the top of the boiler had never been cleaned and that he was following his superior officers' instructions as to the manner in which he should perform his job and the route that he should use to reach the work area. This is sufficient to support the jury's finding that his employer was negligent and that this negligence, as well as the unseaworthy condition of the vessel, contributed to Mr. Selico's injury.
Nor do we find that the jury erred when it found that Mr. Selico was not contributorily negligent. The law recognizes that a seaman does not have control of his working conditions, and must, to a certain extent, accept those conditions. He, therefore, is not required to devise a safer method for doing his assigned job or ask for additional or different equipment. Hae Woo Youn v. Maritime Overseas Corp., 605 So.2d 187, 198 (La.App. 5 Cir. 1992), judgment set aside in part on other grounds, 623 So.2d 1257 (citing Ceja v. Mike Hooks, Inc., 690 F.2d 1191, 1194 (5th Cir.1982)). His obligation is to obey his superiors and do his work as he is instructed. Id. Mr. Selico testified that he was acting under the orders of the two superior *1245 officers who were supervising the "gagging" of the boiler during the Coast Guard inspection. There is absolutely no evidence to refute this testimony. Defendants, who had the burden to prove that Mr. Selico was negligent and his negligence contributed to his injury, offered nothing that would support a finding that Mr. Selico did anything other than follow the instructions of his superior officers.
The remaining error assigned addresses the award of pre-judgment interest. The trial court granted Mr. Selico's Motion for Judgment Notwithstanding the Verdict on this issue. Because the jury had not considered any evidence as to future damages, and had found that onehalf of Mr. Selico's damages was caused by the vessel's unseaworthiness and one-half caused by the defendants' negligence, the court awarded pre-judgment interest on one-half of the lost wage and damage awards.
A trial court's authority to grant a JNOV under Article 1811 of the Code of Civil Procedure "is limited by the jurisprudence to those cases where the jury's verdict is absolutely unsupported by any competent evidence." Boudreaux v. Schwegmann Giant Supermarkets, 585 So.2d 583, 586 (La.App. 4 Cir.1991), writs denied, 590 So.2d 593, 594 (La.1992). An appellate court reviewing the grant of a JNOV applies the same criteria used by the court below, as set forth in Anderson v. New Orleans Public Service, 583 So.2d 829, 832 (La.1991):
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover.... In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
Pre-judgment interest compensates a plaintiff for the use of money that his employer owed him in connection with its duty under the general maritime law to provide him with maintenance and cure, and is applicable to awards for past injuries only. Verdin v. C & B Boat Co., Inc., 860 F.2d 150, 158 (5th Cir.1988). Pre-judgment interest is not available for awards for negligence under the Jones Act. Ellender v. Texaco, 425 So.2d 291, 296 (La.App. 3 Cir.1982).
The award of prejudgment is appropriate where such an award is necessary to "maintain whole the damages granted a claimant." Havis v. Petroleum Helicopters, Inc., 664 F.2d 54, 55 (5 Cir. 1981), citing Haynes v. Rederi A/S Aladdin, 362 F.2d 345 (5 Cir.1966), cert. denied 385 U.S. 1020, 87 S.Ct. 731, 17 L.Ed.2d 557 (1967). The award of prejudgment interest under the general maritime law is committed to the trial court's discretion. Mitsui & Co., Ltd. v. American Export Lines, Inc., 636 F.2d 807, 823 (2 Cir.1981); Smith v. Two "R" Drilling Co., Inc., 606 So.2d 804, 815 (La.App. 4 Cir.1992). As noted by the Second Circuit, the cases dealing with this element of damage have shown that the factfinder's discretion is a "legal discretion, and the award is to be made whenever damages lawfully due are withheld, unless there are exceptional circumstances to justify the refusal." The Wright, 109 F.2d 699, 702; also see Mitsui supra at 823. This "limit" on the factfinder's discretion is a recognition that the "law's delay" may be used by a defendant as leverage in obtaining a more favorable settlement. Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583, 594 (2 Cir.1961), cert. denied 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962). Even if the defendant ultimately cast in judgment has not deliberately prolonged the *1246 litigation, he has had the use of the money he is declared to owe. It, therefore, would be "inequitable not to make appropriate compensation for delay in discharging the obligation." Id.
There is absolutely no evidence in this record of "exceptional circumstances" that would support the jury's refusal to award pre-judgment interest to Mr. Selico. The jury's determination that the Alaska's unseaworthiness and the defendants' negligence contributed equally to Mr. Selico's injury is a reasonable one, and is supported by the evidence. Finally, because the jury was presented with no evidence regarding future damages, its award necessarily must be based on past damages.
We find, therefore, that the JNOV granted with regard to the denial of prejudgment interest was proper. We also find that the trial court did not err when it awarded pre-judgment interest on one-half of the awards for lost wages and damages, the portion attributed by the fact-finder to the claim under the general maritime law.
AFFIRMED.
BYRNES J., CONCURS WITH REASONS.
PLOTKIN J., DISSENTS IN PART WITH WRITTEN REASONS.
BYRNES, J., CONCURRING WITH REASONS.
I agree with the majority opinion in its entirety. I concur for the sole purpose of restating a point already made in the majority opinion. Therefore, the fact that I concur should not be construed as an indication that anything in the majority opinion is not the opinion of a majority of this panel.
The fact finder has the discretion to deny pre-judgment interest from the date of loss only where there are "peculiar circumstances" that would make it inequitable for the losing party to be forced to pay pre-judgment interest. Lewis v. Maritime Overseas Corp., 98-0437, p. 5 (La.App. 4 Cir. 11/10/98), 723 So.2d 1001, 1004.
In other words, as a matter of law, in the absence of "peculiar circumstances" the fact finder has no discretionary authority to deny pre-judgment interest. Conversely, the existence of "peculiar circumstances" is a prerequisite to the exercise of the discretionary authority to deny pre-judgment interest. The dissent points to no "peculiar circumstances." I find none in the record. Therefore, as a matter of law, it was error for the jury to deny pre-judgment interest.
Smith v. Two R. Drilling Co., Inc., 606 So.2d 804, 815 (La.App. 4 Cir.1992) holds that where there is a jury, if the issue of pre-judgment interest is to be considered, it must be presented to the jury. Under Smith, in a jury trial the trial judge may not award pre-judgment interest without first submitting the question to the jury. However, nothing in Smith prevents the trial judge from reviewing a jury's denial of pre-judgment interest under the same JNOV standards as are applied to any other finding by the jury. There is no authority exempting a jury's denial of pre-judgment interest from JNOV review.
PLOTKIN, J., Dissenting In Part With Written Reasons:
To the extent the majority affirms the trial court's granting of a judgment notwithstanding the verdict ("JNOV") on the prejudgment interest issue, I respectfully dissent because it conflicts with this court's previous jurisprudence on that issue.
Under general maritime law, the award of prejudgment interest is subject to "the discretion of the trier of fact." Smith v. Two "R" Drilling Co., Inc., 606 So.2d 804, 815 (La.App. 4 Cir.1992). In Smith, this court reversed a trial court's decision to grant prejudgment interest in a case tried by a jury, where the prejudgment interest issue was not submitted to the jury. Id. The court stated that the question of prejudgment interest must go to the jury, and held that the plaintiff waived any right to *1247 prejudgment interest when he failed to request that the issue be presented to the jury. Id. In fact, this court said, "[t]he trial judge, as he was not the trier of fact, had no authority to grant an award of prejudgment interest." Id.
In the instant case, the issue of prejudgment interest was submitted to the jury; the jury denied the plaintiff any recovery on this issue. The record shows clearly that the issue of pre-judgment issue was disputed in the trial court. Moreover, the jury interrogatories indicate that the jury understood the issue and made a specific finding that Mr. Selico was not entitled to pre-judgment interest. The other interrogatories indicate that the jury had the ability to separate the issues. Under the circumstances, the jury's denial of pre-judgment interest was obviously a considered decision made in the exercise of the discretion of the trier of fact.
As noted by the majority, a motion for JNOV should be granted only "when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict." Anderson v. New Orleans Public Service, 583 So.2d 829, 832 (La.1991). Given the well-settled principle that prejudgment interest is subject to the discretion of the fact finder, it is apparent that reasonable men could arrive at a contrary verdict. Thus, I believe the trial court improperly granted the JNOV.
I would reverse the JNOV on the prejudgment interest issue and amend the award to delete the prejudgment interest. In all other respects, I agree with the majority's decision to affirm the trial court judgment.