927 So.2d 456 (2006)
Roslyn DAVIS and Murphy Davis
v.
Dr. Edward LAZARUS and Sheila Fontenot, CRNA.
No. 2004-CA-0582.
Court of Appeal of Louisiana, Fourth Circuit.
March 8, 2006.
Rehearing Denied April 12, 2006.
*458 Joseph M. Bruno, Christopher J. Bruno, Bruno & Bruno, New Orleans, Counsel for Plaintiff/Appellee.
Kurt S. Blankenship, Robert I. Baudouin, Blue Williams, L.L.P., Metairie, Counsel for Defendant/Appellant (Dr. Edward Lazarus).
George E. Cain, Ann Marie Leblanc, Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, Counsel for Intervenor/Appellant (The Louisiana Patient's Compensation Fund).
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS Jr., Judge LEON A. CANNIZZARO, Jr., Judge ROLAND L. BELSOME).
MICHAEL E. KIRBY, Judge.
In this medical malpractice case, Dr. Edward Lazarus and the Louisiana Patients' Compensation Fund ("PCF"), appeal the December 5, 2003 trial court judgment in favor of plaintiffs Roslyn and Murphy Davis.
On June 10, 1997, plaintiff Roslyn Davis was admitted to Touro Infirmary for an outpatient laparoscopic surgical procedure. Mrs. Davis' gynecologist, defendant Dr. Edward Lazarus, performed this procedure, which was completed without any immediate evidence of complications. Shortly after arriving in the recovery unit, Mrs. Davis began to experience breathing difficulties. She was diagnosed with a condition known as flash pulmonary edema, and was transported to the hospital's intensive care unit ("ICU"). The flash pulmonary edema was resolved by no later than 7:30 a.m. on June 11, 1997. The plaintiffs do not contend that the flash pulmonary edema was the result of any negligence or fault on the part of Dr. Lazarus.
The medical care at issue in this lawsuit began with Dr. Lazarus' visit with Mrs. Davis on the morning of June 11, 1997. When Dr. Lazarus saw Mrs. Davis at approximately 7:30 a.m., the flash pulmonary edema had cleared. She had a temperature of 100.2. A physical examination revealed that her abdomen was soft, and bowel sounds were present but hypoactive. Dr. Lazarus ordered a complete blood count ("CBC"), started Mrs. Davis on oral fluids, discharged her from the ICU and transferred her to a room in the gynecology ward of the hospital.
At approximately 2:00 p.m. that same day, Dr. Lazarus ordered a flat and erect abdominal x-ray due to a rise in Mrs. Davis' temperature. He also put Mrs. Davis on a broad-spectrum antibiotic. Later that afternoon, Dr. Lazarus viewed the film of the abdominal x-ray with the radiologist. Both thought that the x-ray showed signs of a post-operative ileus, or paralysis of the bowel. They discussed the possibility of a ruptured abdominal viscus or bowel perforation, but Dr. Lazarus did not think that was the case. Mrs. Davis' primary care physician, Dr. Febry, saw Mrs. Davis next at 5:30 p.m. He noted that she had a temperature of 102 and had vomited in *459 recovery post-extubation. Dr. Febry indicated in his notes that he would monitor Mrs. Davis closely for possible evolution of aspirational pneumonia, and that he agreed with Dr. Lazarus' decision to treat Mrs. Davis with the antibiotic, Clarapham.
Dr. Lazarus saw Mrs. Davis at 6:30 p.m. She still had a temperature of 102, and he said he knew Mrs. Davis had been complaining of pain because Dr. Febry had ordered Percocet. He performed a physical examination and found no significant change from his earlier examination. Dr. Lazarus testified that he was concerned because Mrs. Davis was not recovering as normally as he would have expected for someone who had undergone laparoscopy the day before. He ordered additional blood tests, including another CBC. He also ordered a Dulcolax suppository to see if he could get the bowel working by evacuating the rectum and lower colon.
The nursing staff called Dr. Lazarus at 7:30 p.m. that evening, and reported that Mrs. Davis' temperature had spiked to 103. He ordered another CBC, and returned to the hospital at 9:15 p.m. to examine Mrs. Davis after picking up the results of her blood work. Her white blood count was stable so Dr. Lazarus did not think Mrs. Davis' fever was being caused by infection, although he considered it a possibility. He also still considered bowel perforation a possibility at that time, in addition to other possible diagnoses. Dr. Lazarus noted at this visit that Mrs. Davis, who is a nurse, told him she felt that her pain was due to gas, and she requested a rectal tube to try to expel the gas. He gave the order for the rectal tube, and also discussed with Mrs. Davis the possibility of going back into surgery if her condition did not improve.
The next morning, June 12, 1997, Dr. Lazarus saw Mrs. Davis and found a significant change in her condition, namely, an acute abdomen. At that time, Dr. Lazarus made the decision to have a surgical consult with Dr. Ernest Cohen. Dr. Cohen suspected that the cause of the acute abdomen was peritonitis, but recommended surgery to rule out the possibility of a perforated bowel. Dr. Cohen performed surgery that afternoon, and found a perforation in the bowel. In the surgery, he made an open incision, repaired the bowel perforation, irrigated the abdomen to remove material that had entered Mrs. Davis' abdomen as a result of the bowel perforation and then closed the incision. The surgery took approximately one hour. Mrs. Davis remained hospitalized after the surgery until June 19, 1997.
Three days later, on June 22, 1997, Mrs. Davis went to the emergency room complaining of pleuritic chest pain accompanied by fever. She was admitted to the hospital with a diagnosis of atelectasis in the right lower lung fields, with small pleural effusion. In his deposition, Dr. Cohen described atelectasis as "a partial, or can be total, collapse of the lung, where it's not being filled with air." He said that this condition is not uncommon postoperatively in someone who has had a general anesthetic. Mrs. Davis was treated in the hospital with antibiotics and physical therapy until her release on June 25, 1997.
Mrs. Davis was hospitalized again on June 30, 1997 with fever and right pleural fusion. She was diagnosed with right thoracic empyema, which is pus in the chest cavity. Mrs. Davis was treated with antibiotics and underwent thoracentesis for removal of pleural fluid. She was discharged from the hospital on July 5, 1997. She returned to the hospital on July 8, 1997 to receive a blood transfusion due to anemia. Mrs. Davis was also hospitalized in September 1997 for a bowel obstruction.
Mrs. Davis and her husband, Murphy Davis, filed a petition for damages against *460 Dr. Lazarus and Sheila Fontenot, CNRA. Plaintiffs subsequently dismissed Ms. Fontenot from the lawsuit. In their petition, plaintiffs allege that Dr. Lazarus committed medical malpractice by waiting too long to obtain a surgical consult for Mrs. Davis after her laparoscopic surgery, and failing to diagnose her perforated bowel and pleural effusion. Plaintiffs allege that the delay in obtaining a surgical consult required Mrs. Davis to undergo additional medical procedures and caused her to suffer post-traumatic stress disorder. Following a jury trial, the jury returned a verdict finding that Dr. Lazarus breached the standard of care, but that his breach was not a cause of the damages complained of by plaintiffs. The trial court rendered judgment in conformity with the jury's verdict, and dismissed plaintiffs' case against Dr. Lazarus with prejudice.
Following the trial court's judgment, the plaintiffs filed a motion for new trial and/or a motion for judgment notwithstanding the verdict ("JNOV"). The trial court granted both motions, and rendered judgment in favor of plaintiffs and against Dr. Lazarus. The trial court awarded Mrs. Davis $350,000.00 for pain, suffering and mental anguish, and $107,549.53 for past medical bills. The court awarded Mr. Davis $50,000.00 for loss of consortium.
Dr. Lazarus filed a motion for new trial, asking the trial court to vacate its judgment granting plaintiffs' motions for JNOV and new trial, and to reinstate the original judgment. Alternatively, Dr. Lazarus asked for the court's judgment to be amended to reflect his participation in the PCF and to recognize his immunity to a judgment in excess of $100,000.00.
On December 5, 2003, the trial court denied Dr. Lazarus' motion for new trial as to the trial court's granting of plaintiffs' motions for JNOV and new trial. However, the trial court granted Dr. Lazarus' motion for new trial solely for the purpose of conforming the previous judgment to the limitation of liability provided in the Louisiana Medical Malpractice Act. The amended judgment stated that because Dr. Lazarus is a qualified health care provider under the Louisiana Medical Malpractice Act, La. R.S. 40:1299 et seq., the judgment in favor of plaintiffs and against Dr. Lazarus is limited to the sum of $100,000.00 plus judicial interest from the date of plaintiffs' filing of their claim with the PCF. The trial court recast the previous judgment to award Mrs. Davis $350,000.00 for pain, suffering and mental anguish and $107,549.53 for past medical bills, plus interest from the date of the filing of the complaint with the PCF. The court awarded Mr. Davis $50,000.00 for loss of consortium, plus judicial interest from the date of the filing of the complaint with the PCF. The amended judgment stated that the plaintiffs' rights against the PCF are reserved to them as provided by law. The trial court granted the PCF's petition to intervene in this matter for the purpose of appealing the December 5, 2003 trial court judgment. Dr. Lazarus and the PCF both filed timely appeals in this matter.
On appeal, both Dr. Lazarus and PCF argue that the trial court erred in granting the plaintiffs' motions for JNOV and for new trial, and in awarding excessive damages. Additionally, the PCF argues that the trial court committed reversible error in allowing hearsay evidence over the objection of Dr. Lazarus.
In a medical malpractice action against a physician, a plaintiff must first establish by a preponderance of the evidence that the physician's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and *461 the injury sustained. La. R.S. 9:2794; Madison v. Ernest N. Morial Convention Center-New Orleans, XXXX-XXXX (La.App. 4 Cir. 12/4/02), 834 So.2d 578. As stated above, the jury found that Dr. Lazarus breached the standard of care, but that his breach was not a cause of the damages complained of by plaintiffs. After initially rendering judgment in conformity with the jury's verdict and dismissing plaintiffs' claim against Dr. Lazarus, the trial court granted plaintiffs' motions for JNOV and new trial and rendered judgment in favor of plaintiffs and against Dr. Lazarus and the PCF.
In Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991), the Louisiana Supreme Court set forth the following criteria to be used in determining when a JNOV is proper:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Scott, supra. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
The Supreme Court also set forth the standard of review of a JNOV as follows:
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.
Id. at 832.
Furthermore, as this Court stated in Selico v. Intercontinental Bulk Tank Corporation, 98-0763, p. 9 (La.App. 4 Cir. 5/12/99), 733 So.2d 1240, 1245, a trial court's authority to grant a JNOV under Louisiana Code of Civil Procedure Article 1811 is limited by the jurisprudence to those cases where the jury's verdict is absolutely unsupported by any competent evidence. (Emphasis ours.) The Fifth Circuit further amplified the strict standard for JNOV in the case of State, Department of Transportation and Development v. August Christina & Brothers, Inc., 97-244, pp. 8-9 (La.App. 5 Cir. 2/11/98), 716 So.2d 372, 377, as follows:
It is elementary that where a case is tried by a jury, that jury is the trier of fact. La. C.C.P. art. 1736, Scott v. Hosp. Serv. Dist. No. 1, 496 So.2d 270 (La.1986); Clayton v. State, Dept. Of Transp. & Development, 599 So.2d 394, 396 (La.App. 5 Cir.1992). The granting of a JNOV completely abrogates and nullifies this basic, mandated and well established role of the jury and, therefore, such action by a trial judge must *462 always be reviewed with great care and caution. Clayton v. State, Dept. Of Transp. & Development, supra at 396; Jinks v. Wright, 520 So.2d 792 (La.App. 3 Cir.1987). [emphasis in original.]
The trial court issued written reasons for judgment in support of its decision to grant the JNOV. The trial court stated that "there are facts and inferences from the evidence that strongly and overwhelmingly point to a conclusion different than that reached by the jury." The court stated that the evidence reflected that Dr. Lazarus breached the standard of care by failing to timely operate on Mrs. Davis. The court further stated that Dr. Cohen and Dr. Michael Seneff both testified that had Dr. Lazarus operated on Mrs. Davis 15-24 hours earlier, there would have been 15-24 hours of less bacteria, including fecal matter pooling in her abdominal area. The court noted that Dr. Lazarus admitted that the most likely cause of the bowel injury was the June 10, 1997 laparoscopic surgery. The court found that the evidence presented on causation established that Mrs. Davis suffered harm due to the delay in bringing her back to surgery. The court stated that its granting of plaintiffs' motion for new trial was based on its finding that the jury's verdict is contrary to the law and evidence.
On the issue of causation, the plaintiffs presented expert witness testimony that Dr. Lazarus' delay in requesting a surgical consult (waiting until the morning of June 12, 1997 rather than ordering the consult on the evening of June 11, 1997) caused plaintiff to undergo additional medical treatment and hospitalizations. Dr. Michael Seneff, an expert in the field of critical care medicine from Chevy Chase, Maryland, testified that his opinion was that Mrs. Davis should have been taken to surgery on the evening on June 11, 1997 because it was obvious at that time that she had complications from her laparoscopic surgery, and delaying the inevitable was not appropriate. He stated that the results of Mrs. Davis' blood count study on the evening of June 11, 1997 required that she be taken to surgery immediately. His opinion is the delay in taking Mrs. Davis back to surgery was the cause for her subsequent hospitalizations on June 22, 1997 and June 30, 1997 for the pleural effusion and empyema. He also said the delay in bringing Mrs. Davis back to surgery caused her July 6, 1997 hospitalization for anemia. However, he testified that he could not state with a reasonable degree of certainty that Mrs. Davis' September 1997 hospitalization for a bowel obstruction was caused by a delay in surgery.
Dr. Joel Engel, an expert in obstetrics and gynecology from Atlanta, Georgia, stated that a bowel perforation is an accepted risk of the type of laparoscopic surgery that Dr. Lazarus performed on Mrs. Davis, but that Dr. Lazarus' delay in responding surgically to the pooling of bacteria in Mrs. Davis' abdomen deprived her of a better outcome. He said the longer the delay, more bowel is lost and there is more post-operative scarring, adhesions and pain.
The defense presented the deposition testimony of Dr. Ernest Cohen, an expert in general surgery. Dr. Cohen is the surgeon who repaired Mrs. Davis' perforated bowel in surgery on the afternoon of June 12, 1997. He stated that if Mrs. Davis had been brought into surgery the night before, the length of the surgery would not have been different. He said he disagreed with Dr. Seneff's opinion that the results of Mrs. Davis' blood count study on the evening of June 11, 1997 were enough to warrant taking Mrs. Davis into surgery right away that evening.
*463 Most importantly, Dr. Cohen testified that he could not determine in surgery when the bowel actually became perforated. He said the bowel might not have been perforated when Dr. Lazarus last saw Mrs. Davis on the evening of June 11th. He said that it is possible that Mrs. Davis had an area of dead or dying wall of her bowel from injury from the harmonic scalpel used in the surgery and that this portion of her bowel did not actually perforate until late on the 11th or on the 12th of June. Therefore, because the time that the perforation occurred was unknown, he could not say for sure whether going back to surgery 24 hours earlier would have resulted in 24 hours of less bacteria and fecal matter pooling in Mrs. Davis' abdomen. Dr. Cohen also stated that if fecal matter gets into a patient's abdominal cavity through a bowel perforation, peritonitis could develop even if the fecal matter is only there for a very short time. He said the amount of time that an infection is in the intra-abdominal space and the patient's outcome are not always related. He also said that perforations are a known complication of abdominal surgeries. He did not relate Mrs. Davis' subsequent hospitalization for atelectasis or empyema or the September 1997 bowel obstruction to the intra-abdominal infection or to the fact that surgery was performed on June 12, 1997 instead of on June 11, 1997.
Dr. Lazarus also presented the testimony of Dr. Ryckman Caplan and Dr. George Morris, both experts in the field of obstetrics and gynecology. Both testified that Dr. Lazarus did not breach the standard of care in this case. Both also testified that the results of Mrs. Davis' blood count study on the evening of June 11, 1997 were not enough to warrant taking Mrs. Davis into surgery right away that evening.
In reasons for judgment, the trial court stated that both Dr. Seneff and Dr. Cohen testified that had Dr. Lazarus operated on Mrs. Davis 15-24 hours earlier, there would have been 15-24 hours of less bacteria, including fecal matter pooling in her abdominal area. While that statement does accurately reflect Dr. Seneff's testimony on that issue, it does not accurately reflect Dr. Cohen's testimony. The portion of Dr. Cohen's testimony on that issue is quoted as follows:
Q. And you would agree that if you had gone in 24 hours earlier, Miss Davis would have 24 hours less of bacteria and fecal matter that would have been pooling in her abdomen?
A. Possibly. That's if she had perforated 24 hours earlier or 12 hours earlier. We don't know she had perforated then. She might have had an area of dead wall of her bowel or dying wall of her bowel from the harmonic scalpel injury, which didn't actually perforate until late the 11th or the 12th. We don't know that.
After reviewing the expert testimony on the issue of causation, we conclude that the jury's finding that Dr. Lazarus' breach of the standard of care was not a cause of plaintiffs' damages is supported by the testimony of Dr. Cohen. Although the expert witness testimony presented by plaintiffs strongly supports their position that their damages were caused by Dr. Lazarus' breach of the standard of care, there is competent evidence in the record supporting the jury's verdict. Furthermore, unlike Dr. Cohen, who operated on Mrs. Davis and repaired her bowel perforation, both Dr. Seneff and Dr. Engel were consulted for litigation purposes only, did not examine Mrs. Davis and based their opinions solely on medical records.
*464 As a general rule, a treating physician's opinion is entitled to greater weight than that of a physician who has been consulted for litigation purposes only. Devlin v. Westinghouse Electric Corporation, 96-484 (La.App. 5 Cir. 12/11/96), 686 So.2d 920. This is especially true when the physician consulted for litigation does not examine the patient, but bases his opinion solely on medical records. Id. The jury obviously gave greater weight to the testimony of Dr. Cohen than to the plaintiffs' expert witnesses, and they were entitled to do so.
We find that the trial court erred in granting the JNOV. The facts and inferences in this case do not point so strongly and overwhelmingly in favor of the plaintiffs that reasonable jurors could not arrive at a verdict in favor of Dr. Lazarus. We conclude that Dr. Cohen's testimony provides a reasonable basis for the jury's finding that plaintiffs' did not carry their burden of proving that Dr. Lazarus' breach of the standard of care caused Mrs. Davis' subsequent medical procedures and hospitalizations. Furthermore, after reviewing the testimony of Eileen Burke, social worker, and Dr. Harvey Rifkin, psychiatrist, we find that the jury could have reasonably concluded that Mrs. Davis' psychological injuries were not caused by Dr. Lazarus' breach of the standard of care. Accordingly, judgment should have been rendered in conformity with the jury's verdict.
The PCF raises the issue of the admissibility of a statement allegedly made by Dr. Cohen to Dr. Lazarus in Mrs. Davis' presence on the morning on June 12, 1997. Mrs. Davis testified that Dr. Cohen came into her hospital room to determine if she needed surgery. Dr. Lazarus was also present in the room. Mrs. Davis testified that Dr. Cohen looked at her and then said to Dr. Lazarus, "Why did you wait so long to call me?" Counsel for Dr. Lazarus objected to the admissibility of this statement, arguing that it was inadmissible hearsay. The objection was overruled.
In this appeal, the PCF argues that the trial court's decision to allow this hearsay statement into evidence was reversible error. The plaintiffs argue that this statement was probably admitted under the excited utterance exception to the hearsay rule.
The statement in question goes to the issue of whether or not Dr. Lazarus breached the standard of care in this case. The plaintiffs were required to prove both a breach of the standard of care and that the breach was a cause of the damages complained of. The jury found that plaintiffs did not prove the causation element. We have concluded that there is competent evidence in the record to support that finding, and that the trial court erred in granting the JNOV. Because of our conclusion, we need not address the issue of the admissibility of the statement in question or the issue of whether the damages awarded were excessive.
Dr. Lazarus and the PCF also argue that the trial court erred in granting plaintiffs' motion for new trial. The trial court's reason for granting a new trial was based on its finding that the jury verdict was clearly contrary to the law and evidence because "the evidence presented on causation established that Ms. Davis suffered harm due to the delay in bringing her back to surgery." The standard to be used by a trial court in granting a motion for new trial is different than the standard for granting a JNOV. In Martin v. Heritage Manor South, XXXX-XXXX, pp. 4-5 (La.4/3/01), 784 So.2d 627, 631-632, the Louisiana Supreme Court explained these different standards as follows:
A motion for a new trial requires a less stringent test than for a JNOV as such a *465 determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. Id. "Although the language is similar between the standards for a JNOV and new trial, there is a real difference between a finding that no evidence existed for a rational jury to reach a particular result and a finding that a jury could not have reached its conclusion on any fair interpretation of the evidence." Gibson [v. Bossier City General Hosp.], supra[, 594 So.2d 1332] at 1336 [La.App. 2 Cir. 11/26/91]. Notably, in considering whether the verdict was supported by any "fair interpretation of the evidence" on a motion for new trial, the trial judge is free to weigh the evidence and make credibility determinations, and is not required to view the evidence in the light most favorable to the non-movant as on a JNOV motion.
The standard of appellate review in ruling on a motion for new trial is whether the trial court abused its discretion. Anthony v. Davis Lumber, 629 So.2d 329 (La.1993). This case involved a dispute between medical experts as to whether the breach of the standard of care by Dr. Lazarus was the cause of Mrs. Davis' subsequent medical procedures and hospitalizations. Although plaintiffs presented substantial evidence supporting their position that the breach of the standard of care caused their damages, Dr. Lazarus presented expert witness testimony in support of his position that the damages were not the result of a breach of the standard of care, including testimony from the surgeon who repaired Mrs. Davis' bowel perforation. The jury obviously accepted the evidence offered by Dr. Lazarus, and found that the plaintiffs did not carry their burden of proving that Dr. Lazarus' breach of the standard of care caused plaintiffs' damages.
Although a trial court has discretion in granting or denying a motion for new trial, that discretion is not without limits. Martin v. Heritage Manor South, XXXX-XXXX, p. 14 (La.4/3/01), 784 So.2d 627, 637. A jury verdict cannot be set aside on the grounds that the verdict is contrary to the evidence if it is supportable by any fair interpretation of the evidence. Martin v. Heritage Manor South, supra, p. 15, 784 So.2d at 637.[1] In this case, we find that the trial court abused its discretion in granting plaintiffs' motion for new trial, as the jury's verdict that Dr. Lazarus' breach of the standard of care was not a cause of the damages complained of by plaintiffs is supportable by a fair interpretation of the evidence.
For the reasons stated above, the trial court's granting of JNOV in plaintiffs' favor is hereby reversed. The trial court's granting of plaintiffs' motion for new trial is also reversed. The jury's verdict is reinstated, and judgment is hereby rendered dismissing plaintiffs' claims against Dr. Lazarus with prejudice.
REVERSED AND RENDERED.
TOBIAS, J., concurs in the result and assigns reasons.
ARMSTRONG, C.J., respectfully dissents.
BELSOME, J., dissents for the reasons assigned by ARMSTRONG, C.J.
TOBIAS, J., Concurring in the Result.
I respectfully concur in the result.
This case has an unusual set of procedural defects that should preclude this court for the present from ruling upon the trial court's granting of the motion for *466 judgment notwithstanding the verdict ("JNOV").
La. C.C.P. art. 2087 D states that "[a]n order of appeal is premature if granted before the court disposes of all timely filed motions for new trial or judgment notwithstanding the verdict. The order becomes effective upon the denial of such motions." [Emphasis supplied.]
The trial court rendered a judgment on 15 October 2003 that granted both the plaintiffs' motions for JNOV and new trial. Then, on 5 December 2003, the trial court rendered an amended judgment that I find should only be read as superseding in its entirety the 15 October 2003 judgment. The 5 December 2003 judgment granted the motion for JNOV but is entirely silent with respect to the motion for new trial.
La. C.C.P. art. 1811 C states:
(1) If the motion for a judgment notwithstanding the verdict is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed and shall specify the grounds for granting or denying the motion for a new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment.
(2) If the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court orders otherwise.

(3) If the motion for a new trial has been conditionally denied and the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court. [Emphasis supplied.]
I do not find that the two judgments (of 15 October and 5 December 2003) can be read together for I find that the 5 December 2005 judgment clearly demonstrates that the trial court has not ruled upon the motion for new trial in this case; the court withdrew its ruling on the motion for new trial in its 5 December 2003 judgment. The present appeal is therefore, in my view, premature until the trial court rules upon that motion for new trial. I therefore think that the majority errs in presently reviewing the trial court's granting of the JNOV.
However, I find that I am bound by the Louisiana Supreme Court's ruling in Va-Salle v. Wal-Mart Stores, Inc., 01-0462 (La.11/28/01), 801 So.2d 331, which holds that if the motion for JNOV has been improperly granted and the trial court fails to rule upon a motion for new trial that was coupled with the motion for JNOV, judicial economy dictates that the appellate court should rule upon the motion for new trial. Id. at pp. 17-18, 801 So.2d at 342. Because I find the majority's analysis that the trial court erred in granting the JNOV is correct as a matter of law, although in my view prematurely decided, I am required to concur in the result.
Given my druthers and following La. C.C.P. arts. 1811 and 2087, I would (1) vacate the trial court's 5 December 2003 judgment, (2) remand the case to the trial court to render a new judgment on the motion for JNOV, and (3) remand the case to the trial court for a formal ruling upon the motion for new trial, either (a) granting it, (b) conditionally granting it by following the mandate of La. C.C.P. art. 1811 C, or (c) denying it. Upon so ruling on both the motions for JNOV and new trial, the appeal would be ripe for consideration.
ARMSTRONG, C.J., Respectfully Dissenting.
While I agree with the standard of review for a JNOV as stated by the majority; *467 and I essentially agree with most of the facts as set forth by the majority, when I apply the standard of review to the facts, I find no error in the trial court's decision to grant a JNOV.
It is true that a JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991). This is essentially the same as the manifest error standard of review. In other words, for a trial judge to grant a JNOV she must, in effect, find that the jury verdict was manifestly erroneous.
I also recognize as set forth by the majority that this Court stated in Selico v. Intercontinental Bulk Tank Corporation, 98-0763, p. 9 (La.App. 4 Cir. 5/12/99), 733 So.2d 1240, 1245, that a JNOV is only appropriate where "the jury's verdict is absolutely unsupported by any competent evidence."
I further agree with the finding of the majority that the record supports the finding that Dr. Lazarus breached the standard of care.
Therefore, the crux of this appeal is the question of whether the record permits a finding by the jury that the perforation of Ms. Davis' bowel which led to her infection and claim for damages occurred subsequent to the time Dr. Lazarus performed the operation. If the perforation occurred subsequent to the operation, then Dr. Lazarus would not have had reason to suspect the existence of the problem as soon as would be expected had the perforation of the bowel occurred immediately during the course of the operation.
However, Dr. Lazarus admitted that the injury most likely occurred during the course of the operation:
Q. Isn't the most likely cause of the bowel injury in this patient, either the insertion of the primary Trocar, or when you were lysing (phonetic) adhesions with the harmonic scalpel?
A. Yes, sir.
Appellants do not contend that we should not believe this admission against interest made by Dr. Lazarus. Instead they make no mention of this testimony and prefer to rely on testimony from Dr. Cohen suggesting the possibility that the bowel perforation did not occur until after the operation. In other words, what this appeal really boils down to is whether the jury was entitled to rely on the existence of a mere possibility favorable to the defendants in preference to a probability in favor of the plaintiffs. This Court would find a jury verdict in favor of the plaintiff manifestly erroneous where the record would support a finding of no more than a mere possibility of the defendant's negligence. Likewise, this Court should not allow a jury verdict to stand in favor of the defendant when the best that defendant can do is offer some uncertain evidence of the existence of the mere possibility of a favorable view of the facts in the face of credible evidence that, more likely than not, the defendant is at fault. Therefore, I believe that the trial court made the correct decision in granting the JNOV.
For the foregoing reasons, I would affirm the judgment of the trial court.
BELSOME, J., Dissents for the Reasons Assigned by Chief Judge ARMSTRONG.
NOTES
[1] See also Campbell v. Tork, Inc., XXXX-XXXX (La.2/20/04), 870 So.2d 968.